No. 81-446

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

RICHARD A. DYBVIK,

            Plaintiff and Appellant,

    vs.

MARY DYBVIK,

            Defendant and Respondent.

IN THE MATTER OF THE ESTATE OF
HJORDIS BINGHAM, Deceased.

IN THE MATTER OF THE ESTATE OF
TRYGVIE A. DYBVIK, Deceased.

Appeal from:  District Court of the Fourteenth Judicial District,
              In and for the County of Musselshell
              Honorable Nat Allen, Judge presiding.

Counsel of Record:

    For Plaintiff:

        Linda L. Harris, Billings, Montana
        Alan J. Lerner, Big Fork, Montana

    For Defendant:

        Herndon, Harper & Munro, Billings, Montana

                    Submitted on briefs: July 29, 1982

                            Decided: December 9, 1982

Filed: DEC 9 - 1982

*Thomas J. Kearney*
_____
                        Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from a judgment entered in the Fourteenth Judicial District in and for the County of Musselshell. The original action was commenced by Richard Dybvik, alleging damages and unlawful occupation of real property. The defendant, Mary Dybvik, filed an answer and cross-complaint denying the principal allegations of the complaint and further alleging that Richard Dybvik had obtained title to the real property through undue influence. Richard Dybvik answered by denying any undue influence and cross-claimed for damages for fradulent, malicious, and intentional acts of Mary Dybvik in her attempt to deny him of his property. This action was later consolidated with two other probate causes. The judgment, entered on June 19, 1981, set aside a power of attorney, a will, and a deed; all on grounds of undue influence.

The appellant raises the following issues on appeal: (1) whether the District Court's findings of fact, conclusions of law, and opinion are supported by substantial evidence; (2) whether or not there was any act of undue influence in procurement of the power of attorney, the will, and the deed; and (3) if the District Court erred in its judgment, whether this case should be remanded for further proceedings relating to plaintiff's original complaint for damages.

We found no error in the trial court's decision to set aside the deed but reverse the findings and conclusions of the court that respondent established, by clear and convincing evidence, that the will and the power of attorney were acquired through means and influence of the beneficiary, Richard Dybvik, and not done with the free will of Hjordis Bingham.

In March of 1979, Hjordis Bingham, an elderly lady in her seventies, was in poor health. At that time she was living in California. On or about March 30 she was admitted to Temple Community Hopsital in Los Angeles. Hospital personnel, concerned

- 2 -

with her ability to care for herself and her affairs, sought to contact members of her family. The hospital contacted Thomas Ask, the family attorney in Roundup, Montana. Mr. Ask then contacted Trygvie Dybvik, the brother of Hjordis. Trygvie contacted his son, Richard Dybvik, who agreed to go to California to see what could be done. Richard went to California and met his aunt for the first time. Within one week he obtained a general power of attorney allowing him to handle all of her affairs. At this time Hjordis Bingham had four different bank accounts totaling $32,131.09. There was extensive testimony at trial regarding the subsequent expenditure of these funds. It is sufficient to note that when Richard Dybvik gained control over the four accounts, the funds were soon depleted.

After obtaining the power of attorney, Richard moved Hjordis from the hospital to Virgil Convalescent Home, located in Los Angeles. Toward the end of May arrangements were made to move Hjordis to Montana. An apartment was rented in Roundup. Richard and his wife were to live with and care for Hjordis. Shortly after arriving in Roundup Hjordis was again admitted to hospital care. Doctor Davis of Roundup confirmed the diagnosis of doctors at Temple Community Hospital in Los Angeles; that Hjordis was suffering from chronic organic brain syndrome and other physical ailments.

On June 13, 1979, Hjordis was discharged from the Roundup hospital to live with her nephew and his wife. Approximately one month later, on July 10, 1979, Hjordis executed a new will in which she left all of her personal and real property to Richard Dybvik. Richard testified that Hjordis had asked him to contact Mr. Ask so that arrangements could be made to draft the new will.

Mr. Ask had previously probated the estate of the deceased's father, and had known the deceased for a number of years. He testified that he was called by the hospital administrator in California in April 1979 because some of his letterheads were found in her apartment. He was advised that she was seriously

ill and asked to contact her brother, Trygvie. He did so and found him too ill to travel so Trygvie contacted his son Richard in Arizona and got him to go to California to check up on his aunt. According to Mr. Ask's testimony Richard asked him what to do and he advised him to be "appointed conservator or guardian" or at least get a power of attorney from her so that her business matters, rent, hospital, medical, etc., bills could be paid.

Concerning the drawing of the will he testified he was called by Richard early in July to come see his aunt about drawing a new will and that he did so on July 10. He went to her apartment to get the details of the new will but before doing so he visited with her for it was the first time he had seen her since she returned to Roundup. His testimony of this visit is important and controlling as to her mental condition that day and it is set forth as follows:

"Q. Did she tell you what she wanted done with her property for purposes of the will? A. Yes.

"Q. And what was that? A. Well, she was always concerned about her brother, Trygvie Dybvik, but she told me when I visited her on that day that she had visited with him, or talked to him on the phone, and he was in, you know, poor health, but she felt that he was getting the veteran's pension and he was at the Veteran's Hospital in Miles City and drew Social Security, so she thought he was pretty well taken care of. And she wanted to make her will leaving all of her property to her nephew, Richard Dybvik.

"Q. Did she make any comments about Mary Dybvik at that time? A. Yes. Over the years, she and Mary, I guess, have had a feud for many years, and she definitely, on that day, said she didn't want Mary to have her property if anything happened to her; and that's why she wanted to give it to Richard, and she felt that Trigger was taken care of, you know, and so she didn't have that much obligation to him.

"Q. Do you recall who contacted you with regard to seeing Hjordis? A. I think Richard told me she wanted to see me, and probably about the 9th, I suppose, in the morning, I told him, 'Well, I'll stop either going home at lunch or on the way back from lunch.'

"Q. Who else was present when you talked to Hjordis? A. No one. Just Hjordis and myself.

"Q. Do you recall how long you talked to her? A. Oh, I suppose I was there maybe 20 minutes. I think Richard and his wife may have been there when I got there. They kind of had a--she was still ill. She was in a housecoat, and I think they left when I got there. I know they weren't in on the conversation at all.

"Q. The will was executed July 10, 1979. Can you explain the circumstances under which that was executed? A. Well, I told her that I would fix it and I would come up the next day, so we worked it out at noon that we would stop on the way home, and the witnesses were John Pratt, my partner, and Julie Ann, our secretary, so we all stopped on our way home from lunch. I got there first so she would have a chance to look over the will, and then John Pratt came and our secretary came. She had read the will, and I went over it with her; and she signed it and they witnessed it and I notarized it.

"Q. Did you leave the will with Hjordis when you went? A. Yes, and apparently I left a copy there too. A lot of people want an extra copy so they can put the will in their box and a copy to look at if they want to, and that one you showed me is the copy I made for her, because it is my printing.

"Q. On both of those occasions, July 9, 1979, and July 10, 1979, did you make any observations about Hjordis' mental state? A. Well, it seemed to me that she was about the way I always remember her, other than she had been sick, it was obvious. She was thinner and weaker, but other than that, I thought she was competent and about the same as she had always been.

"Q. At that time did she know who she was? A. Oh, yes.

"Q. Did she know who you were? A. She knew who I was, and we visited.

"Q. Did she know who Richard was? A. Oh, yeah.

"Q. Did she know the ranch she was disposing of in the will? A. Yeah, she talked about that, because over the years, her brother, Trigger, has used the ranch and run cattle on there; and this was apparently part of their arrangement that she was kind of helping him that way, that he had the use of it, but she talked about things. There was nothing unusual that she didn't know what she was doing.

"Q. On both of these occasions, did Hjordis Bingham express a concern that this property not go to Mary Dybvik? A. Oh, yes.

"Q. Was she very adament about that? A. Yes, and she had been over the years. She wanted Trigger taken care of--her brother,

- 5 -

that's his nickname--but she didn't want Mary
or her boys to have any of her property.

"Q. Did she ever refer to Mary and her
children as 'Mary and her chickens,' that you
can recall? A. I don't remember. I know
that there was ill-feeling between them, and I
don't know how Mary felt about it, but I try
to stay out of personalities.

"Q. But to the best of your knowledge, had
this been a long-standing feud between Mary
Dybvik and her? A. Yes, Mary ran a nursing
home, and her mother was there, and Hjordis
came up and visited, and I suppose they had
arguments; and I don't know--like I say, I
don't want to get involved with them, but she
didn't like her."

Before her death she executed a deed. Hjordis owned a ranch
near Roundup that her brother Trygvie had been managing. On
August 27, 1979, she deeded this property to her nephew, Richard
Dybvik. Richard testified that Hjordis requested this trans-
action so she would be eligible for Medicaid benefits. Richard
again contacted Mr. Ask to do the legal work. Mr. Ask prepared
the deed and gave it to Richard who then drove to Lewistown to
get it executed. He contacted an attorney in Lewistown who met
with Hjordis for the signing. The same day Richard recorded the
deed with the Musselshell County Clerk and Recorder. Eventually,
the appellant, Richard Dybvik, took steps to force his father and
stepmother to vacate the ranch and thereafter commenced this
action for damages.

The appellant argues that the record will not support a
finding of undue influence. In conjunction with this issue he
urges this Court to reconsider the standard of review of a
District Court's findings. In this case the District Court
adopted the respondent's findings of fact verbatim. While we
have focused on this situation before, Tomaskie v. Tomaskie
(1981), ____ Mont. ____ , ____ , 625 P.2d 536, 539, 38 St.Rep. 416,
419, cautioning District Courts who rely "too heavily on the pro-
posed findings and conclusions submitted by the winning party,"
we are not compelled to change the rule. "Findings of fact shall
not be set aside unless clearly erroneous. . ." Rule 52(a),
M.R.Civ.P. As we have noted before, although the findings may

not technically be the work product of the district judge, once they are signed they become his. In Re the Marriage of Jensen v. Jensen (1981), _ ___ Mont. _ _ , 631 P.2d 700, 38 St.Rep. 1109; City of Billings v. Public Service Commission (1981), ____ Mont. ____, 631 P.2d 1295, 38 St.Rep. 1162.

Other decisions have further defined the limits of our inquiry. Of foremost importance, we cannot deviate from our function as an appellate court. Our functions do not include a retrial of the case. We will not substitute our judgment for that of the trial court. We are "'confined to determining whether there is substantial credible evidence to support' the findings of fact and conclusions of law." Cameron v. Cameron (1978), 179 Mont. 219, 227, 587 P.2d 939, 944; In the Matter of the Estate of LaTray (1979), ____ Mont. ____, 598 P.2d 619, 36 St.Rep. 1514; Olson v. Westfork Properties, Inc. (1976), 171 Mont. 154, 557 P.2d 821; Hornung v. Estate of Lagerquist (1970), 155 Mont. 412, 473 P.2d 541; State Highway Comm. v. West Great Falls Flood Control and Drainage District (1970), 155 Mont. 157, 468 P.2d 753.

We have elaborated on this standard numerous times and several well-settled principles have emerged. We view the evidence in the light most favorable to the prevailing party. Cameron v. Cameron, supra; Olson v. Westfork Properties, Inc., supra; Hellickson v. Barrett Mobile Home Transport, Inc. (1973), 161 Mont. 455, 507 P.2d 523. "The evidence may be inherently weak and still be deemed 'substantial' and . . . substantial evidence may conflict with other evidence presented." Campeau v. Lewis (1965), 144 Mont. 543, 547, 398 P.2d 960, 962; Cameron, 179 Mont. at 228, 587 P.2d at 945.

With the above principles in mind it is helpful to review the law dealing specifically with undue influence. Undue influence has been defined by section 28-2-407, MCA:

"Undue influence consists in:

"(1) the use by one in whom a confidence is reposed by another or who holds a real or

- 7 -

apparent authority over him of such confidence or authority for the purpose of obtaining an unfair advantage over him;

"(2) taking an unfair advantage of another's weakness of mind; or

"(3) taking a grossly oppressive and unfair advantage of another's necessities or distress."

In evaluating whether there is substantial credible evidence to support a finding of "undue influence" with respect to the deed we find subsection 1 of section 28-2-407, MCA, to be controlling. There is evidence to support a finding that Hjordis reposed confidence in her nephew, Richard Dybvik and that pursuant to the terms of the deed Richard gained an advantage over Hjordis. While Hjordis was still alive, she divested herself in her interest in real property and conveyed it to Richard. The District Court therefore had evidence that Richard, in a trust relationship with his aunt, gained an unfair advantage over her which supports setting aside the deed.

With respect to the will, a different test of undue influence must be applied. Hjordis, through the will, is making a disposition of property to occur after her death. The testamentary disposition creates a conflict between Richard Dybvik and Mary Dybvik.

This Court has held on numerous occasions that a will may not be defeated on grounds of undue influence unless:

"the testator is induced, by the means employed, to execute an instrument in form and appearance his will, but in reality expressing testamentary dispositions which he would not have voluntarily made, and that to defeat a will, the undue influence must have been directed toward the particular testamentary act and at the time thereof, or so near thereto as to be operative. In the Matter of the Estate of Maricich (1965), 145 Mont. 146, 159, 400 P.2d 873, 880.

Furthermore, as noted by this Court in Blackmer v. Blackmer (1974), 165 Mont. 69, 525 P.2d 559, undue influence or incompetence is never presumed and must be proven, like any other fact. In Blackmer although there was a showing of an opportunity to exercise undue influence on the testator, it was not suf-

ficient to prove undue influence and invalidate the will. Under the facts of the Blackmer case, the testator was an elderly person (as in this case) and had infirmities associated with old age, including poor eyesight, failing memory, occasional confusion and senility. These facts did not render the testatrix testamentally incapacitated, but were matters to be taken into consideration and corrolated with the alleged acts of influence to determine if the acts amounted to undue influence.

Here, the uncontradicted testimony showed that the appellant, Richard, called Mr. Ask, the attorney who had represented Hjordis since the 1960's, and that the call was made at her specific request and instructions. There is not even the slightest suggestion in the findings and conclusions of the District Court that Richard participated in the preparation of the will or that he dictated the will's terms. It would appear to us, the converse is true since Mr. Ask's testimony was not impeached. Mr. Ask had known the testator for a period of time and knew her feelings regarding the Dybvik ranch. He testified about their conversations regarding the terms of the will and her reasons for leaving the ranch to Richard, her nephew. It was his conclusion that on the day that the will was drawn, July 10, 1979, that she was not under the influence of any person whatsoever, and indeed that she knew what she was doing and was mentally no different than she had been at different times that he had represented her. Here, there is no finding of the District Court nor any evidence to show "a mirrored prior solicitation," on the appellant, Richard's, part.

We find the District Court's findings and conclusions and opinion as to undue influence regarding the will to be insufficient, as a matter of law, because they fail to show that at the time of the execution of the will, the proponent, did a specific act to procure the new will or to influence his aunt, Hjordis. Without an act of procurement or a specific act to influence, it is clear that a case of undue influence was not

established. We reverse the trial court's finding that as to the will undue influence was used by the appellant and reinstate the last will and testament.

The case is remanded to the trial court. The judgment of the District Court holding that the deed was illegally procured is upheld, the findings and conclusions that the will and the power of attorney were obtained by undue influence is set aside and the will is reinstated and the cause is remanded for further proceedings on the original complaint.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

- 10 -