No. 83-427

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

_____

CURTIS R. ADAMS, as personal representative
of the Estate of IDA MAY ADAMS, Deceased,

Plaintiff and Respondent,

-vs-

ILA ALLEN, a/k/a ILA ANDERSON,

Defendant, Third Party Plaintiff
and Appellant,

-vs-

CURTIS ADAMS and JOHN FAIRBAIRN,

Third Party Defendants and
Respondents.

_____

APPEAL FROM: District Court of the Nineteenth Judicial District,
In and for the County of Lincoln,
The Honorable Robert M. Holter, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

John L. Petersen, Missoula, Montana

For Respondents:

David W. Harman, Libby, Montana

_____

Submitted on Briefs: December 22, 1983

Decided: April 5, 1984

Filed:   APR 5  1984

_____
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Ila Allen, a/k/a Ila Anderson appeals the judgment of the District Court for the Nineteenth Judicial District, Lincoln County, which declared void a trust agreement, a deed and a power of appointment signed by Allen's friend, Ida Adams. We affirm the judgment.

Ida Adams was a resident of Libby, Montana, and at her death, the owner of the Cherry Creek Trailer Court. During her lifetime she undertook various businesses and occupations. She had two natural sons and numerous foster children. Dora Fairbairn was a very close friend and Adams treated her like a daughter. Fairbairn lived in Adams' trailer court and during Adams' last years, spent considerable time taking care of Adams.

On March 17, 1974, Adams executed a will granting Dora Fairbairn a life estate in the trailer court, with the remainder to Adams' sons, Curtis and Robert.

Adams suffered from diabetes, angina pectoris and cerebral strokes for at least the last two years of her life. As a result of the diabetes, she lost her sight almost completely; thus, she required much assistance in getting around. Adams was hospitalized in the Libby Hospital nine times between December of 1978 and February of 1980 and her treating physician was Dr. W. D. Matthews.

In March of 1980, Adams traveled to Spokane, Washington, with Ila Allen to attend a wedding and to undergo physical examinations by Spokane physicians. When not in Sacred Heart Hospital, Adams stayed with Allen. Sometime during Adams' stay in Spokane, Allen telephoned Charles Cruikshank, her

- 2 -

attorney in Great Falls, Montana. Based on the call, Cruikshank prepared a quitclaim deed and a trust agreement which would transfer the Libby trailer court to a trust, with Allen as trustee. The income from the trust was to go to Adams during her lifetime; the property was to be transferred to Allen upon Adams' death.

Cruikshank drove to Spokane on March 16, 1980 and visited Adams in the hospital. While there, Cruikshank first spoke with Adams' doctors and reviewed her records. He then spent approximately one hour explaining the trust agreement to Adams. She signed the agreement, the deed and a handwritten power of appointment and the deed was acknowledged by Cruikshank as a Montana notary public. Allen, who was also at the hospital, signed both the agreement and the power of appointment. At the same time, Adams assigned a potential Black Lung case to Allen, as trustee, which was then transferred to the trust. The parties also discussed a potential malpractice case against Adams' Libby physician.

On April 6, 1980, Dora Fairbairn arrived in Spokane and took Adams out of the hospital and back to Libby. Approximately nine hours later Adams died while at Fairbairn's home.

Curtis Adams, as the personal representative of Ida Adams' estate, brought suit against Allen, seeking to have the trust agreement and the deed set aside. Allen counterclaimed against Adams' estate and crossclaimed against Curtis Adams and John Fairbairn (Dora's brother) seeking rent due. After a hearing held June 7, 1983, the District Court entered its findings, conclusions and order. It found that Ida Adams "evidenced a decline in mental capacity, including

increased forgetfulness, hallucinations and instability. She was incapable of making major decisions because of the fluctuating condition of her mind." As to Allen's relationship with Adams, the court found that although Allen had been acquainted with Adams for a number of years, she had not previously been a part of the circle of Adams' closer friends. The District Court found that Adams did not talk to anyone but Cruikshank regarding the papers she signed while in Spokane, and that the only evidence presented as to Adams' condition at the time of signing was testimony by Cruikshank and Allen. The court rejected the testimony as inconsistent with the descriptions of Adams' condition just prior to and after the date of signing.

Based on the foregoing, the District Court concluded that (1) Adams' physical condition prevented her from withstanding the influence of Allen; (2) Adams' mental condition before, on, and after March 16, 1980 "afflicted" her ability to withstand Allen's influence; (3) Adams' disposition of her property by execution of the deed and trust agreement was unnatural, as it did not include gifts to the natural objects of her bounty, her two sons and Dora Fairbairn; and (4) the trust agreement was not based on consideration, was not properly notarized or timely filed and was signed by Adams as a mistake as she thought she was signing some other papers.

The District Court declared the trust agreement, the deed and the power of appointment void. Allen appealed, raising the following issues:

1. Did the District Court properly find that Allen exerted undue influence over Adams so as to make her sign the trust agreement, power of appointment, and deed?

- 4 -

2. Did the District Court properly find the trust agreement void because (1) no consideration passed from Adams to Allen; (2) it was improperly notarized; and (3) Adams was mistaken as to what she signed?

The standard of review in this case is whether there was substantial evidence to support the District Court's findings. Viewing the evidence in a light most favorable to the prevailing party, we are free to reverse the judgment only if there is a lack of substantial evidence to support the judgment. Dybvik v. Dybvik (Mont. 1982), 654 P.2d 989, 39 St.Rep. 2184; In re LaTray's Estate (1979), 183 Mont. 141, 598 P.2d 619. The findings of fact must be clearly erroneous. Rule 52(a), M.R.Civ.P.

It is well settled in Montana case law that undue influence must be proven by the person contesting a will or contract. Blackmer v. Blackmer (1974), 165 Mont. 69, 525 P.2d 559; In re Maricich's Estate (1965), 145 Mont. 146, 400 P.2d 873. Undue influence negates the free consent necessary for the proper formation of a contract. Sections 28-2-301 and 28-2-401, MCA. Section 28-2-407, MCA, defines undue influence:

"Undue influence consists in:

"(1) the use by one in whom a confidence is reposed by another or who holds a real or apparent authority over him of such confidence or authority for the purpose of obtaining an unfair advantage over him:

"(2) taking an unfair advantage of another's weakness of mind; or

"(3) taking a grossly oppressive and unfair advantage of another's necessities or distress."

This Court, in Maricich, 145 Mont. at 161, 400 P.2d at 881, held that the following factors are to be considered in determining whether undue influence exists:

"(1) Confidential relationship of the person attempting to influence the testator;

"(2) The physical condition of the testator as it affects his ability to withstand the influence;

"(3) The mental condition of the testator as it affects his ability to withstand influence;

"(4) The unnaturalness of the disposition as it relates to showing an unbalanced mind or a mind easily susceptible to undue influence; and

"(5) The demands and importunities as they may affect particular testator taking into consideration the time, the place, and all the surrounding circumstances."

Allen concedes that a confidential relationship existed between Adams and her and that the disposition of Adams' property under the trust agreement was unnatural.

As to Adams' physical condition, there was testimony at trial that her illness had greatly affected her ability to move around freely. She required aid because she could not see and because medication had to be administered regularly. The time spent in the Libby hospital and then the Spokane hospital is evidence of her serious illnesses.

There was also testimony presented as to Adams' deteriorating mental condition. Her treating physician in Libby, Dr. W. D. Matthews, testified that because her life was becoming so inhibited by her illnesses, she was considerably unhappy. Moreover, she was forgetful and would sometimes hallucinate. Testimony by one of the registered nurses who cared for Adams in the Libby hospital indicated that, during the nights of her last stay in January and February, Adams would exhibit forgetfulness and irritability.

Other friends of Adams testified that she was getting harder to converse with as she was forgetful and unable to maintain a train of thought. She appeared overly concerned about being taken care of by friends and family rather than being placed in a nursing home.

As to the fifth factor, we must consider the time, place and circumstances of any demands and importunities made by Allen. There was no evidence presented at the trial of this case of specific demands or importunities by Allen. But there was no testimony by anyone other than Allen and Cruikshank as to the circumstances surrounding the solicitation of Cruikshank as Adams' attorney or the signing of the papers at the Spokane hospital. The District Court concluded that the sequence of events, starting with Adams' travel to Spokane with Allen, was evidence sufficient to find that Allen had influenced Adams unduly to have papers drawn to transfer her property to Allen.

The District Court went a step further and declared in a post-trial memorandum that the case involved a presumption that evidence not produced as to Adams' mental capacity at the time she signed the papers was adverse to Allen's case. The court stated that:

> ". . . In cases of incompetency, or suspected incompetency, the usual practice is to call upon doctors and nurses from the confining hospital to clearly show mental capacity at that time. Because Defendant [Allen], through her attorney, chose the trust dispositional device, the whole transaction becomes odious. Hence, and under these special circumstances, the failure to involve persons knowledgeable of decedent's condition at the time of signing and as witnesses at this trial certainly raises the presumption under Section 26-1-602(6) MCA, in spite of the fact that the burden is on the Plaintiff to show undue influence. Thus, and again in these peculiar circumstances, the lack of evidence is in itself evidence."

- 7 -

Section 26-1-602(6), MCA, states as a disputable presumption that "[m]ore satisfactory evidence would be adverse if weaker and less satisfactory evidence is offered and it is within the power of the party to offer more satisfactory evidence."

Allen contends that the lack of evidence produced on this issue should be held against the plaintiff as a failure to sustain the burden of proof of undue influence. Therefore, she argues that the lack should not be the basis for a presumption which works against Allen. Adams argues that, although this Court has denounced such a presumption in previous cases, it would be appropriate in cases like this.

It is true that in Blackmer v. Blackmer (1974), 165 Mont. 69, 74, 525 P.2d 559, 562, this Court stated:

> "Argument by the parties concerns the connotation of the presumption as used by the trial court in its conclusion of law No. 2. Disregarding matters raised outside the record we will only comment that these circumstances in Montana raise no presumption of any kind. Undue influence or incompetence is never presumed and must be proven, like any other fact. In re Cocanougher's Estate, 141 Mont. 16, 375 P.2d 1009."

This holding is consistent with previous Montana case law, including In re Cocanougher's Estate (1962), 141 Mont. 16, 375 P.2d 1009, which rejected any shifting of burdens of proof as to undue influence.

The presumption noted and used by the District Court in this case regards only a presumption as to the type and lack of evidence of demands and importunities by Allen. The presumption does not effect Adams' burden of proof of undue influence. We find no error in use of the section 26-1-602(6), MCA, presumption where it leaves undisturbed a plaintiff's burden of proof.

The record provides evidence of Allen's alleged purposes for taking an interest in Ida Adams. Claiming that she wanted to know what Adams' medical condition was before agreeing to take care of her, and that Adams' preferred treatment in a Spokane clinic to that she got in Libby, Allen took her to Spokane. As to how her attorney became involved, Allen testified:

"Q. You said Mr. Cruikshank represented you in a private matter, is that correct? A. Yes.

"Q. All right. Was he representing you, at the time, February and March of 1980? A. I don't think so.

"Q. How long a period of -- before that, had he represented you? A. A couple of years, I think.

". . .

"Q. Now, did you call him and -- in regard to Ida Adams? A. Yes. I called him and asked him if he would consider representing her.

"Q. And did she tell you to call him? A. Yes.

"Q. Did you discuss Mr. Cruikshank with her? A. Yes.

"Q. What -- where did you call from? A. The first time I -- I think I called from the house, here in Libby.

"Q. Uh-huh. Did you describe what was going on to him? A. I don't remember.

"Q. Did he ever meet with Ida Adams before meeting with her in the hospital in Spokane? "A. Not personally. He talked to her over the telephone.

"Q. And he has represented you since that time, as I understand it, is that correct? "A. No -- other than in this case? No.

Mr. Cruikshank testified regarding his visit with Adams in the Spokane hospital:

". . . I did have extensive discussions with her for, approximately an hour, where I went paragraph by paragraph of the Trust Agreement and discussed it with her, read it to her, explained it to her, answered her questions, which I recall were not very much, and finally said, 'Do you want Ila to

take care of you and worry about your property and
get this Black Lung thing collected and manage the
trailer court, and just make it so you don't have
any problems and you would never have to go in the
trailer court?' And she said, 'That's exactly what
I want.' I said, 'I am competent [sic] with you
signing the Trust and Assignment.' And she did
execute it at that point.

". . .

"Q. In your estate planning of Ikey [Ida], did you
ever ask her about her Will? A. Yes, sir, I did.

"Q. Did you obtain a copy of that Will? A. No, I
did not.

"Q. When Ikey and you were in the day room, did
she have her glasses on? A. I don't recall her
having glasses on.

"Q. Did she have a magnifying glass? A. Not that
I know of.

"Q. Was she dressed in hospital garb at that time?
A. Yes, sir.

"Q. Did you read the Trust Agreement to her?
A. Yes, sir.

"Q. Did she read it? A. No, sir.

"Q. I believe your testimony was that you had
asked Ikey if she wanted Ila to take care of her
affairs and then had the Agreement signed, is that
correct? A. That was at the tail end of the
conversation -- or something to that affect, yes."

Cruikshank's testimony that Adams, at the hospital meeting,
was lucid and acting voluntarily does not negate the fact
that she was seriously ill and incapable of even reading what
she was signing.

The nature of undue influence is that the will of the
persuading person is substituted for the will of the person
who is unable to withstand the persuasion. When free agency
and free consent are lost, the agreement in question must be
declared void. Applying the five factors of Maricich here,
we conclude that the findings of the District Court are
supported by substantial evidence and are not clearly

- 10 -

erroneous.  Therefore, consideration of the second issue is unnecessary.

Affirmed.

_____
                              Justice

We Concur:

_____
      Chief Justice

_____

L. C. Gulbrandson.
_____
Justices