FILED

JUL 08 1996

Ed Smith
CLERK OF SUPREME COURT
MONTANA MONTANA



NO.   95-541

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

---

IN RE THE MATTER OF BABY M

---

APPEAL FROM:   District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Hon. Maurice C. Colberg, Jr., Judge presiding.


COUNSEL OF RECORD:

For Appellant:

Marvin L. Howe, Simonton, Howe & Schneider,
Glendive, Montana

For Respondent:

Thomas J. Lynaugh, Lynaugh, Fitzgerald,
Eiselein & Eakin, Billings, Montana

---

Submitted on Briefs:   April 4, 1996

Decided: July 8, 1996

Filed:

_____
Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

Petitioner T.M. filed a petition in the Thirteenth Judicial District Court in Yellowstone County to revoke her relinquishment of parental rights and to withdraw her consent to adoption. After a trial, the District Court entered its order and judgment in favor of the respondent, Catholic Social Services of Montana, Inc. We affirm the order and judgment of the District Court.

The issues on appeal are:

1. Did the District Court err when it concluded that T.M. voluntarily relinquished her parental rights to Baby M.?

2. Did the Court err when it terminated T.M.'s parental rights?

## FACTS

T.M. became pregnant in April 1994. She was thirty-five years old, unmarried, and living with her family. She told neither her family nor the natural father about her pregnancy. Instead, she left her family home and moved to an out-of-state location during the pregnancy.

In October, while out of state, T.M. first contacted Catholic Social Services (CSS) to inquire about options available to her. CSS offers services which include pregnancy counseling, the adoptive placement of children, and single parent counseling. CSS gave T.M. information on how to contact its Eastern Montana representative, Tylene Merkel, whom T.M. contacted in October 1994. Merkel and T.M. first talked by telephone and then on October 30,

2

1994, met in person.  They also spoke on the telephone and met on several other occasions prior to the baby's birth on December 23, 1994.

On December 30, Merkel and T.M. met to discuss foster care and T.M. signed a parental agreement that allowed CSS to place her baby in foster care and provided that she agreed "to notify a representative of [CSS] of my decision as to whether or not to release [the baby] for adoption on or before Jan. 23, 1994 [sic]." On December 30, 1994, CSS placed the baby in foster care and T.M. moved back into her family's home but still did not inform her parents that she had given birth to the baby.

On February 7, 1996, T.M. told Merkel she wished to place her child for adoption, and on February 9, 1995, she signed a document entitled "A Relinquishment of Parental Rights and Consent to Adoption."  At that same time, T.M. signed an open adoption agreement and invoked her right to privacy.  She also signed a document entitled "Deposition Upon Written Questions" in which she exercised her right to privacy and refused to name the child's father.

On that same day, the prospective adoptive parents took physical custody of Baby M.  Two days later, on February 11, 1995, T.M. called them and asked for her child back.  Merkel then arranged for the prospective adoptive parents, T.M., and her to meet at a motel in Miles City on February 12, 1995, to return the baby to T.M.  In Miles City, however, T.M. indicated to Merkel and

the adoptive parents that she had decided to go through with the placement of Baby M. for adoption. Therefore, the couple returned to Broadus with the baby.

On February 15, 1995, CSS filed a petition in District Court to terminate the parental rights of T.M. and the birth father. On the same day, pursuant to § 40-6-135(6), MCA, the District Court entered an order terminating the parental rights of T.M. and the birth father. The order stated that permanent legal custody of Baby M. was granted to CSS with the right to appear in any court where adoption proceedings are pending to consent to the adoption of Baby M.

CSS and the prospective adoptive parents also entered into an Adoptive Home Agreement on February 15, 1996, which formalized the physical placement for adoption that had been done on February 9, 1995.

On April 26, 1995, T.M. filed a petition to revoke the relinquishment of parental rights and consent to adoption that she signed on February 9, 1995. She moved for the revocation pursuant to § 40-6-135 and § 40-8-112, MCA, and also claimed that she entered into the relinquishment agreement involuntarily.

On July 24, 1995, after a hearing, the court entered an order in which it concluded that T.M.'s acts of relinquishment of Baby M. and execution of the documents relinquishing parental rights and giving consent to adoption were voluntary and not procured by duress or undue influence.

## ISSUE 1

Did the District Court err when it concluded that T.M. voluntarily relinquished her parental rights to Baby M.?

Conclusions of law are reviewed to determine whether the district court's interpretation and application of the law is correct. *Jim's Excavating Serv.*, Inc. *v. HKM Assocs.* (1994), 265 Mont. 494, 501, *878* P.2d 248, *252.* We review underlying factual findings to determine whether they are clearly erroneous. Rule 52(a), M.R.Civ.P.; *Brown v. Tintinger* (1990), 245 Mont. 373, 377, 801 P.2d 607, 609. In determining whether factual findings are clearly erroneous we look to whether they are supported by substantial evidence and give due regard to the opportunity of the trial court to judge the credibility of the witnesses. Rule 52(a), M.R.Civ.P.

T.M. brought an action for revocation of her relinquishment of parental rights pursuant to § 40-6-135(8), MCA, and alleged that she did not voluntarily sign the relinquishment because it was procured by duress, coercion, or undue influence by Tylene Merkel, a representative for CSS.

Section 40-6-135(8), MCA, governs the rights of a person to revoke a relinquishment and provides in pertinent part:

> Upon petition of a person who executed a relinquishment . . . the court with which the relinquishment was filed may grant a hearing to consider whether the relinquishment should be revoked. A relinquishment may not be revoked if the child has been placed for adoption.

*5*

In this case, the parties concede that Baby M. has been placed for adoption. Therefore, T.M. is precluded from revoking the relinquishment pursuant to § 40-6-135(8), MCA.

As with any contract, however, T.M.'s relinquishment may be set aside if legal cause to do so is proven. In this case, T.M. also alleges that the relinquishment was procured by duress, coercion, or undue influence by Tylene Merkel. Section 28-2-1711(1), MCA, provides that a party may rescind a contract "if the consent of the party rescinding . . . was given by mistake or obtained through <u>duress</u>, menace, fraud, or <u>undue influence.</u>" (Emphasis added.)

Section 28-2-407, MCA, provides that undue influence consists of:

> (1) the use by one in whom a confidence is reposed by another or who holds a real or apparent authority over him of such confidence or authority for the purpose of obtaining an unfair advantage over him;
> (2) taking an unfair advantage of another's weakness of mind; or
> (3) taking a grossly oppressive and unfair advantage of another's necessities or distress.

It is well settled that undue influence must be proven by the person contesting the contract. *In re Marriage of Brownell* (1993), 263 Mont. 78, 83, *865* P.2d 307, 310; *Adams v. Allen* (1984), 209 Mont. 149, 153, 679 P.2d 1232, 1235. We have set forth five factors to consider when a party alleges undue influence with regard to wills:

> (1) Confidential relationship by the person attempting the influence;
>
> (2) The physical condition of the person being influenced;

6

(3) The mental condition of the person being influenced;

(4) The unnaturalness of the disposition as it relates to showing an unbalanced mind or a mind susceptible to undue influence; and

(5) The demands as they may affect the particular person taking into consideration time, place and all circumstances.

*Christensen v. Britton* (1989), 240 Mont. 393, 398, 784 P.2d 908, 911; *see also*

*In re Estate of Hogan* (1985), 218 Mont. 428, 431, 708 P.2d 1018, 1020.

However, although these factors are important, they give only a means of attempting to prove or a means of analyzing undue influence. For there to be undue influence it is necessary that there be a destruction of free agency. *Estate of Hogan*, 218 Mont. at 431, 708 P.2d at 1020.

A thorough review of the record reveals that the District Court's findings were not clearly erroneous and that its conclusions based on those findings (that relinquishment was voluntary and therefore without coercion, duress, or undue influence) was correct.

The record reveals that prior to the birth of Baby M., in October 1994, T.M. first contacted CSS, and from that time until February 7, 1995, T.M. had several contacts with CSS and its representative, Merkel. They met for the first time on October 30, 1994, and discussed the options available to T.M. Merkel testified that at the meeting T.M. indicated that she preferred a closed adoption and described the type of family she wished to have adopt

7

her child. Merkel then gave T.M. information related to the options available.

Merkel also testified that the two met again on November 6, 1994, and T.M. questioned whether an adoption would be appropriate; however, T.M. later indicated that she thought adoption would be best for her baby and that she still wanted a closed adoption. Merkel testified that at that meeting T.M. also discussed the birth father and her criticisms of him as a person.

Later in November, the two met again and discussed the profiles of the various families who wished to adopt the child. In December, T.M. missed some appointments with Merkel, but attended others and talked on the telephone to Merkel.

After the baby's birth, T.M. signed a parental agreement that allowed CSS to place the baby in foster care. Merkel testified that after CSS placed the baby in foster care, T.M. and Merkel had several discussions. For example, on January 2, 1995, T.M. called Merkel and told her that the decision was hard and that she was concerned about what the right decision would be. On January 13, T.M. informed Merkel that she still had not made a decision. Then, on January 16, the two met and T.M. told Merkel that "I think I'm going to go ahead and adopt him out. My reasons are still there." According to Merkel, at the January 16 meeting, she also gave T.M. forms of waiver of parental rights similar to the documents ultimately signed by T.M. On January 25, T.M. and Merkel met again

8

and T.M. signed another parental agreement which provided for foster care until February 23, 1995.

T.M. met the proposed adoptive parents on January 30, 1995. The next day, Merkel called T.M. to see if she had made a decision. T.M. testified that she was offended that Merkel had called her so soon and told Merkel that she had not made a decision and that she needed some more time. Merkel then told T.M. that if she decided to adopt, arrangements would have to be made with the adoptive parents so she needed to know by the end of the week. T.M. testified that she knew the baby was in foster care and that she needed to make a decision so she called Merkel the next day and, referring to whether she would place the baby for adoption, said, "Yeah, I guess so."

Merkel testified that on February 7, 1995, T.M., of her own volition, called her and indicated that she wanted to go through with the adoption. Merkel made notes of that conversation and quoted T.M. as saying, "I need to do this. He needs to go to his new family . . . I need to move on. It is what I'm going to do, so I just need to quit putting it off." A few days prior to February 7 T.M. had called the foster mother, and indicated to her that it was her intention to place Baby M. for adoption. Even weeks earlier, on January 16, 1995, T.M. told Merkel that "I think I'm going to go ahead and adopt him out. My reasons are still there."

9

On February 9, 1995, T.M. signed three documents in connection with her decision to place for adoption. The first document was the Open Adoption Agreement. At the hearing, when asked if an open adoption was what she wanted, T.M. replied, "Yeah, I had decided after meeting the [prospective adoptive parents] that I would go open adoption, if I went adoption." Merkel testified that T.M. had input into various sections of the agreement and set the times and places of visits. Merkel also testified that T.M. did not appear distressed or confused and gave definite and voluntary input to this document.

T.M. also signed the Deposition Upon Written Questions on February 9, 1995. The document was necessary because T.M. wanted to claim a right to privacy and not divulge the father's name. Merkel testified that she gave T.M. the document to read, that she read each question and answered the questions in her own handwriting, and that T.M. did not appear confused or upset while answering these questions. Some of the questions T.M. answered include the following:

> INTERROGATORY NO. 21: Has anyone pressured or coerced you into making the decision to relinquish your custody rights to the child for the purposes of placing the child for adoption? If so, please state the names and addresses of those persons.
>
> ANSWER: No.
>
> INTERROGATORY NO. 23: Has any adoption agency forced or pressured you into making the decision to relinquish custody of your child for adoption?
>
> ANSWER: No.

10

INTERROGATORY NO. 24: Have you voluntarily reached a decision to relinquish custody of the child to an adoption agency?

ANSWER: Yes.

Finally, on February 9, 1995, T.M. signed the third document, the actual Relinquishment of Parental Rights at issue in this case. Merkel testified that she had given a copy of this document to T.M. on January 16 and asked her to review it, and that when T.M. came to the meeting on February 9, she indicated that she had reviewed it and did not need to read it again. Merkel also testified that she asked her to read it again, that she again asked her if she had any questions, and that T.M. did not have any questions.

Merkel also testified that she asked T.M. if she understood what the document would do and that T.M. responded that if she signed the document she would be giving away her parental rights to Baby M. In response to another question from Merkel as to how long the relinquishment was good for, T.M. answered, "forever." Merkel then asked T.M. if she was signing the document of her own free will and she responded that she was.

While CSS and T.M. agree that a confidential relationship existed between Merkel and T.M., there was substantial evidence that the other factors set forth in *Hogan* are not present. First, the evidence reveals that T.M.'s physical and mental condition was consistent with that of a normal mother faced with the difficult decision of whether to place her child for adoption. T.M. had not only received a high school diploma, but also earned a four-year

11

college degree. She was thirty-five years old and managed a business owned by her family. T.M. was definite from the beginning about her reasons to place her child for adoption--a concern about single parenting and not wanting the birth father involved. The testimony reveals that she initiated discussions about the type of adoption and the profile for the adoptive parents. And, although T.M. contends that she was very upset at critical times in this case, substantial evidence was offered to prove that she knew what she was doing and understood the effect of signing the papers.

Also, the decision to place her child for adoption was not an unnatural disposition which shows "an unbalanced mind or a mind susceptible to undue influence." Instead, T.M. contacted the adoption agency long before the child was born because of legitimate personal reasons for considering adoption. She had from December 23, 1994, until February 9, 1995, to carefully consider her decision to place Baby M. for adoption. Moreover, during that time, she had unlimited access to her child. The evidence shows that T.M.'s decision to adopt was the result of her thoughtful consideration of the pros and cons of placement for adoption as opposed to being a single parent.

The last factor to consider in a determination of undue influence is "the demands as they may affect the particular person taking into consideration time, place and all circumstances." T.M. fails to present evidence that CSS put demands on her. Instead,

the evidence reveals that CSS offered the child back to T.M. on two separate occasions--February 9 and 12, 1995.

T.M. testified that on February 9, 1995, after she signed the relinquishment and gave the baby to the adoptive parents, she questioned whether she could go through with the adoption. She further testified that Merkel gave her the option of taking the baby with her then, but that she replied, "Well, all right then. I guess I'll go say goodbye to him."

On February 12, the parties all traveled to Miles City to give the baby back to T.M. She testified that although she had, by this time, told her mother and sister about the baby, she traveled alone from her home to the meeting in Miles City. She arrived in Miles City early and testified that Merkel was rude to her and asked her to come back later because the adoptive parents were not finished saying goodbye to the baby. T.M. also testified that she responded by saying, "Well, you know, I'd like to talk to them. Maybe they can have him. Maybe I've decided they can have him." T.M. further testified:

> I can't remember my exact words. She [Merkel] said, "Are you at peace with that in your heart?" And I, you know, I said, "yeah, I guess," or whatever. And I said, "Now, do I have some time? Do I have six months to change my mind?" And she said, "No."

A review of the record reveals that substantial evidence supports the District Court's findings and conclusions that T.M.'s relinquishment of parental rights was voluntary and not the result of duress, coercion, or undue influence.

13

In conclusion, we note that the adoption statutes set forth procedures to be followed in an adoption and provide safeguards for both the natural parents, the child, and the adoptive parents. While the natural parent's reconsideration is understandable, this case exemplifies the limits placed upon a natural parent's ability to revoke a voluntarily signed relinquishment--a safeguard for the adoptive parents and the child. Simply put, a relinquishment cannot be revoked merely because the natural parent changes his or her mind. As one court noted: "The certainty which is so important to the security of the children and the peace of mind of those who want to adopt them justifies the barrier the statute erects to a revocation of consent." *Matter of Navaho Cty. Juvenile Action* (Ariz Ct. App . 1991), *831* P.2d 368, 373.

For these reasons, we conclude that T.M. signed the parental relinquishment voluntarily, and we affirm the District Court's order and judgment.

ISSUE 2

Did the Court err when it terminated T.M.'s parental rights?

T.M. contends that her parental rights were illegally terminated by the District Court on February 15, 1995, because she was not given an opportunity to appear before the court at a hearing to terminate her rights. T.M. neither raised this issue below nor appealed from the February 15, 1995, order terminating parental rights. It is well settled that we will not consider issues raised for the first time on appeal. *Fandrich v. Capital Ford Lincoln*

*14*

*Mercury* (1995), 272 Mont. 425, 431, 901 P.2d 112, 116; *Hislop v. Cady* (1993), 261 Mont. 243, 250, 862 P.2d 388, 392; *Weaver v. Law Firm of Graybill* (1990), 246 Mont. 175, 180, 803 P.2d 1089, 1092-93. We also will not review orders from which no appeal has been taken. Rule 4, M.R.App.P. We will therefore not consider this issue.

For these reasons we affirm the District Court's order and judgment.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

15

## CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

x Marvin L. Howe
SIMONTON, HOWE & SCHNEIDER, P.C.
P.O. Box 1250
Glendive, MT 59330

Kevin T. Sweeney
Sweeney & Healow
1250 15th Street West, Ste. 202
Billings, MT 59102

x Thomas J. Lynaugh
Lynaugh, Fitzgerald, Eisellein & Eakin
P.O. Box 1729
Billings, MT 59103-1729

Ann Liechty
Gannett, Anderson & Liechty
P.O. Box 1375
Billings, MT 59103

William P. Driscoll
Gough, Shanahan, Johnson & Waterman
P.O. Box 1715
Helena, MT 59624-1715

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy