No. 85-69

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

IN THE MATTER OF THE ESTATE OF
ASMUND AAGESON, Deceased.

APPEAL FROM: District Court of the Twelfth Judicial District,
In and for the County of Hill,
The Honorable M. James Sorte, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Moses Law Firm, Billings, Montana

For Respondent:

Aronow, Anderson, Beatty & Lee, Shelby, Montana
Waldo Spangelo, Havre, Montana

Submitted on Briefs: April 25, 1985
Decided: July 11, 1985

Filed: JUL 11 1985

*Ethel M. Harrison*

Clerk

Mr. Justice Frank B. Morrison, Jr. delivered the Opinion of the Court.

Three children of the deceased, Asmund Aageson, appeal the December 7, 1984, order of the Twelfth Judicial District Court dismissing their petitions for probate of wills dated September 5, 1980, and July 15, 1980. By that same order, the District Court admitted into probate a will dated December 30, 1964, together with its two codicils, dated December 17, 1974, and November 10, 1975. We affirm the order of the District Court.

Asmund and Ella Aageson, husband and wife, operated a farm north of Gildford, Montana, consisting of approximately 1,980 acres. They had five children, one of whom predeceased his parents. The remaining four are Arvin, Eugene, Delia (Lorraine) and Nan. Lorraine and Nan moved from Montana in the 1940's and now live in California and Washington, respectively. Eugene acquired his own farm in the same general area. Arvin served in the military during World War II before returning to the family farm. He then acquired adjacent farm land and entered into a farming partnership with his father in either 1948 or 1949.

Asmund and Ella retired from active farming in 1951 and moved to Seattle, Washington. To facilitate his continued operation of the farm, Arvin was granted a power of attorney permitting him to sell grain, sign checks and enter into farm programs. However, he was not allowed to sell or encumber his parents' land.

Pursuant to an estate plan recommended by Asmund's attorney, Mr. Kilbourne, Asmund and Arvin terminated their partnership in December 1964 and entered into a lease agreement. Asmund and Ella also executed wills dated December 30, 1964, whereby Arvin was to receive 1,020 acres while the

2

remaining 960 acres were to pass one-third each to Eugene, Lorraine and Nan.

Four hundred eighty acres of the farm land were in Ella's name. Under Ella's will, those acres were to be inherited by Arvin, subject to Asmund's life interest in the income from the land. Further, the oil and gas royalties on those lands were to go to Arvin, Eugene, Lorraine and Nan, equally. The remaining 1,500 acres were in Asmund's name. By Asmund's will, Arvin was to receive 540 acres while Eugene, Lorraine and Nan were each to have 320 acres. These lands were subject to the same royalty reservations set forth in Ella's will.

Thereafter, in the early 1970s, Mr. Kilbourne advised Arvin regarding his own estate and recommended that "a generation skipping device" be employed to prevent Arvin's estate from being taxed for the farm lands. Accordingly, Asmund and Ella executed codicils to their wills on December 17, 1974, vesting the lands Arvin was to receive upon their deaths in Arvin's sons, David and Verges. David and Verges had remained at home, assisting their father with the family farm.

Arvin and his sons subsequently formed a partnership, Aageson Grain and Cattle. On November 10, 1975, Asmund and Ella replaced the original 1964 farm lease to Arvin with a new lease to the partnership. The two leases are virtually identical except the lease to the partnership: (1) covered all properties mentioned in the 1964 wills; and (2) granted to the lessee, upon Asmund's death, the option to purchase for $118,680, the 960 acres devised to Eugene, Lorraine and Nan in Asmund's 1964 will, excepting the royalty interests. The $118,680 represented the fair market value of the land at that time. (The fair market value of the land was $356,410 at the time of Asmund's death.)

3

The second codicil, also dated November 10, 1975, refer-enced the new lease and provided that should the option to purchase be exercised, Eugene, Lorraine and Nan would receive the proceeds in equal shares.

In the spring of 1978, David and Verges purchased the family farm from Arvin. In connection with the financing of the purchase, Asmund and Ella executed a mortgage on the lands they had devised to Arvin. The 960 acres devised to Eugene, Lorraine and Nan were not mortgaged so that if the option to purchase was not exercised, the lands would pass unencumbered. With Asmund's and Ella's consent, the existing farm lease was assigned to David and Verges.

Asmund and Ella had sold their home in Seattle in the spring of 1974 and moved into the Tacoma Lutheran Home and Retirement Community in Tacoma, Washington, approximately 12 miles from Nan's home. Nan visited her parents every week-end, taking them shopping and to her home for Sunday dinner. Arvin phoned at least weekly to update his father on the progress of the farm. He also visited his parents several times a year. Eugene's and Lorraine's contact with their parents was more limited.

Ella Aageson died on February 28, 1979. Probate of her 1964 will and its 1974 and 1975 codicils was commenced in the spring of 1980 in Hill County, Montana, with Arvin and Eugene appointed as co-executors of the estate. However, despite three inquiries from this Court, as of the date of the trial of this cause Eugene had failed to execute the final papers.

There was little discord within the Aageson family until Ella's death, when Eugene, Lorraine and Nan learned of the option to purchase their interest in the farm. At Asmund's 91st birthday party on February 25, 1980, the family members and a moderator held a meeting at which Arvin was told of his

4

siblings' dissatisfaction. Arvin was advised not to exercise the option to purchase. An accounting of the farm's proceeds was requested. Nan demanded that Eugene be given his devised land immediately. Arvin refused to acquiesce to the demands of his siblings.

Asmund was present, but did not participate at the meeting. He apparently was unable to either hear or understand what was occurring.

In May 1980, Nan determined that her father needed an attorney to represent his interests. She contacted Warren Peterson, the attorney for the University for which she worked, and requested that he visit with Asmund regarding some estate matters. Though at trial she denied having done so, Nan apparently furnished Peterson with copies of at least her father's will and codicils, and possibly the farm lease. At a meeting on May 27, 1980, Asmund and Peterson discussed the facts that Arvin's fixed price on the option to purchase was too low and would be unfair to Asmund's other children, and that Arvin needed to provide his father with an accounting of the farm's business. Further, Peterson suggested to Asmund, per his deposition, that Peterson write Arvin to inquire as to his willingness to renegotiate the purchase price to reflect the fair market value of the farm upon Asmund's death and to demand an accounting. The letter was written. Upon Asmund's approval, the letter was sent to Arvin. Arvin's reply was an unresponsive, angry letter, which was shown to Asmund by Peterson. Peterson then wrote another letter to Arvin, which apparently went unanswered.

Subsequently, at a July 1, 1980, meeting at the nursing home, Peterson presented Asmund with documents revoking Arvin's power of attorney and granting a new, general power of attorney to Nan, including the right to sell Asmund's

5

land. Those documents were signed and a decision was made to draft a new will, eliminating Arvin and his children. While admitting that the new will was not entirely equitable, Peterson testified at his deposition that he and Asmund thought such a will would be more equitable than the 1964 will, especially since Arvin and his sons would be retaining the option to purchase at a price substantially below fair market value.

Because he was concerned about Asmund's competency to execute a will, Peterson contacted Asmund's doctor, Ernest Randolph. Dr. Randolph responded that on the basis of his monthly visits with Asmund, he was uncertain whether on any given day Asmund would be competent to execute a will. Peterson therefore requested Dr. Randolph's presence at the time of the actual execution, July 15, 1980.

On that date, Dr. Randolph questioned Asmund concerning personal data, his children, his property and the nature of his actions under the new will. Both Dr. Randolph and Peterson were then satisfied that Asmund was competent to execute a will and the will was signed. There were no other witnesses.

Arvin was informed of the revocation of his power of attorney and Nan's general power of attorney on August 11, 1980. He was not told of the new will. Upon legal advice, Arvin presented his father with a new power of attorney for himself, as well as an extension of the existing 1975 farm lease providing that if any farm lands were sold, Arvin would have the right of first refusal to meet the price. These documents were signed in Asmund's room on August 29, 1980. At least four nursing home staff members and a legal secretary witnessed the execution of the documents. Most of those witnesses testified that though they had been skeptical at

6

first, they thought upon seeing and talking with Asmund that he was competent to execute the documents.

Asmund apparently told Nan that Arvin had had him sign some new documents. Nan then contacted Peterson, who recommended that Asmund be brought to see him. Eugene took Asmund to Peterson's office on September 5, 1980. Asmund was unable to remember what documents he had signed for Arvin. Therefore, after satisfying himself that Asmund was again competent to execute a will, Peterson had Asmund re-execute the July 15, 1980, will and sign documents revoking any power of attorney given to Arvin and reestablishing a general power of attorney in Nan.

Arvin took no responsive action. However Nan, on October 24, 1980, through lawyer Peterson, petitioned the court in Tacoma, Washington, to have Asmund declared incompetent and to have herself appointed guardian of his person and estate. A guardian ad litem was appointed to represent Asmund in those proceedings. The court subsequently appointed Nan guardian of Asmund's person. However, on the recommendation of Asmund's guardian ad litem, a bank in Tacoma, Washington, was appointed guardian of Asmund's estate.

Little else relevant to this case occurred until Asmund's death on July 18, 1983. At that time, Nan acquired the 1980 wills from Peterson and gave them to Eugene. On August 3, 1983, Arvin and Eugene, as co-executors of the 1964 will, met with their respective attorneys to obtain Asmund's 1964 will and the 1974 and 1975 codicils from Asmund's safety deposit box. They both signed a petition for probate of that will that same day. However, the next morning, still without disclosing the existence of the 1980 wills, Eugene called Arvin's attorney and advised him not to file the petition.

7

Nothing happened until October 12, 1983, when Arvin, as one of the co-executors of the 1964 will, filed a petition for probate of that will and accompanying codicils. Negotiations between Arvin's and Eugene's attorneys postponed the hearing on that petition until November 29, 1983. Finally, on the evening of November 28, 1983, Eugene's attorney informed Arvin's attorney of the September 5, 1980, will.

Eugene filed that will for probate on the morning of November 29, 1983. During the hearing on the petitions to probate the two wills, held that same day, no mention was made of the July 15, 1980, will. Further, Eugene told the judge that he had not produced the September 1980 will earlier because he "didn't think we would have to produce it . . . [b]ecause we could settle out of court." (Tr. of November 29, 1983, at p. 25.) No determination regarding which will to probate was reached that day and the matter was continued.

The next hearing on the matter was held October 22 and 23, 1984, following which the trial judge admitted the 1964 will and accompanying codicils into probate. In his order, the trial judge held both that Asmund was not competent to execute the 1980 wills and that Asmund had been unduly influenced in executing those wills.

In their appeal of that order, Eugene, Nan and Lorraine raise the following issues:

1. Was there sufficient substantial, credible evidence to support the District Court's conclusion that Asmund Aageson was incompetent on July 15, 1980, at the time he executed his last will and testament of July 15, 1980?

2. Was there sufficient substantial, credible evidence to support the District Court's conclusion that Asmund

8

Aageson was incompetent on September 5, 1980, when he executed his Last Will and Testament dated September 5, 1980?

3. Was there sufficient substantial, credible evidence to support the District Court's conclusion that Asmund Aageson was under the undue influence of Nan Nolkleberg, Eugene Aageson and/or their agents on July 15, 1980, when he executed his last will and testament?

4. Was there sufficient substantial, credible evidence to support the District Court's conclusion that Asmund Aageson was under the undue influence of Nan Nolkleberg, Eugene Aageson or their agents on September 5, 1980, when he executed his last will and testament?

There is some question about whether a testator can be both incompetent and unduly influenced at the same time. Here the trial judge found this testator to be both incompetent and the subject of undue influence. Several cases have held that if you are incompetent then you cannot be the subject of undue influence as the latter presupposes testamentary capacity. For example see Johnson v. Shaver (S.D. 1919), 172 N.W. 676; Moore v. Horne (Tex.Civ.App. 1940), 136 S.W.2d 638. This view has been criticized by text writers. In T. Atkinson, Law of Wills (2d ed. 1953) at page 253, the author states:

> "At the outset it is important to notice language which is sometimes found to the effect that undue influence, fraud and mistake presume a mentally competent testator. It is true that if the testator is incompetent, the other elements may be considered immaterial, for his will is invalid for lack of testamentary capacity alone. However, many wills are contested both on the ground of incapacity and also because of undue influence, fraud, or mistake. It has been held that a will may be invalid for both mental incapacity and undue influence, and that the matters are so closely related that the courts will consider them together. These grounds are not mutually inconsistent in the sense that proof of one disproves the others." (Footnotes omitted)

9

It is true that if a testator is incompetent that should end the inquiry. However, testamentary capacity and undue influence may be considered together in the sense that one who has a weak will is more subject to influence. In this case the evidence of incompetency, standing alone, is not sufficient to support the trial court's finding of mental incapacity. However, the evidence is sufficient to show that the testator was mentally weak and highly suggestible. This, taken together with the evidence of undue influence, supports the trial court's finding that there was in fact undue influence exercised.

Undue influence is defined in § 28-2-407, MCA.

"Undue influence consists in:

"(1) the use by one in whom a confidence is reposed by another or who holds a real or apparent authority over him of such confidence or authority for the purpose of obtaining an unfair advantage over him;

"(2) taking an unfair advantage of another's weakness of mind; or

"(3) taking a grossly oppressive and unfair advantage of another's necessities or distress."

In determining whether or not undue influence has been exercised on a testator making a will, a court must consider:

"(1). Confidential relationship of the person attempting to influence the testator;

"(2). The physical condition of the testator as it affects his ability to withstand the influence;

"(3). The mental condition of the testator as it affects his ability to withstand the influence;

"(4). The unnaturalness of the disposition as it relates to showing an unbalanced mind or a mind easily susceptible to undue influence; and

"(5). The demands and importunities as they may affect particular testator

10

taking into consideration the time, the place, and all the surrounding circumstances." Blackmer v. Blackmer (1974), 165 Mont. 69, 75, 525 P.2d 559, 562.

(1)

## Confidential Relationship

Eugene and Nan enjoyed a confidential relationship with their father. They were Asmund's children and he obviously cared deeply for them. His physical proximity to Nan encouraged a close, confidential relationship. He spent every weekend with Nan and her family. He relied on Nan for companionship as well as for the provision of some of his needs.

(2)

## Physical Condition

Asmund's physical condition was such that he could not easily withstand any influence placed upon him. He was very hard of hearing, and therefore unable to comprehend the activities and meetings occurring around him. This was evidenced by the fact that he was unaware of the animosity between his children at the "meeting" on his 91st birthday.

He was essentially confined to a nursing home, so unable to see for himself how the farm in Montana was progressing. Even when he allegedly told Arvin he wished to visit Montana in the fall of 1980, Nan prohibited him from doing so. His confinement also limited his ability to interact with his children concerning his financial matters or to view for himself how his children were reacting toward those matters. When he was approached by one of his children in the nursing home, he was forced to rely on whatever they said as he had no independent means of verifying the information.

(3)

## Mental Condition

11

Asmund's mental condition made him very susceptible to the influence of those close to him. He suffered from a brain disorder. Several nursing home staff members testified that Asmund's memory was not good, that he suffered day-to-day disorientation with respect to time, place and regular activities. This loss of memory and disorientation resulted in Asmund relying on other individuals for all his needs and information. It also, according to the nurses at the nursing home and Dr. Randolph, left him very susceptible to suggestion and influence.

Dr. Randolph's deposition, which was videotaped and presented at trial in lieu of Dr. Randolph testifying in person, included the following:

"Q (By Mr. Moses) Let me narrow it down if I could. Around late August and early September of 1980--

"A Okay.

"Q --while he was living in the Lutheran Home, Mr. Aageson was living in the Lutheran Home, was he capable of entering into amendments to lease agreements, extending them, and that sort of thing?

"A I would imagine he was capable of it on suggestion, but other than that I can't say that he would be, of his volition would do it, but this I don't know.

"Q But he did understand these things as they were explained to him?

"A I think he could.

"Q Sure. And he could voluntarily enter into these if he understood them?

"A Yes, if they were explained, I think he could understand them.

"Q And the same would be true of a will, and this would be about the time of August 29 to September 5 of 1980?

"A Yes, I think he could probably."
(emphasis supplied) Dep. Tr. at p. 15.

12

We also quote the following excerpt from the testimony of David Fagerly, the Director of the Department of Social Services at the Tacoma Lutheran Home:

> "Q At the last hearing held in November of 1983, you testified specifically that you thought that Mr. Aageson was extremely subject to suggestion or influence of the last person that he talked to, is that correct?
>
> "A Yes, pretty much, yes, I would say particularly someone that he knew; maybe with a complete stranger, maybe not quite as flexible, but very prone still to influence.
>
> "Q Very prone to influence?
>
> "A Extremely, yes.
>
> "Q If someone was to come to him like a son or a daughter, or a representative of that son or daughter, would he be inclined to listen to them and be subjected to influence by them?
>
> "A Yes if he believed they in fact represented the interests of his son or daughter, I believe he would." (emphasis supplied) (Tr. of October 22 and 23, 1984, at pp. 243-244)

(4)

## Unnaturalness of Disposition

As illustrated by the facts set forth at the beginning of this opinion, every action by Asmund since 1948 was directed toward protecting Arvin's interest in the family farm. Therefore, the 1980 wills disinheriting Arvin and his sons are completely unnatural.

(5)

## Demands on Asmund Given Surrounding Circumstances

Eugene, Nan and Lorraine were shocked and greatly upset when they learned of Arvin's option to purchase their interest in the family farm upon their father's death. Nan obtained a lawyer for her father, thus encouraging a change in his testamentary disposition. Eugene hampered the

13

inheritance by Arvin of his mother's 480 acres by refusing to sign the final papers required to probate her will. After Asmund's death, Nan and Eugene attempted to use the 1980 wills as a negotiating instrument to prevent Arvin from exercising his option.

It is clear from the evidence presented that Asmund was the victim of demands by his children to dispose of his farm in the manner they believed best.

There is substantial credible evidence in support of the trial judge's determination that all five factors to be considered when determining whether or not a testator was unduly influenced at the time he made his will are present in this instance. The order of the District Court is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

14