No. 89-219

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

ROSE CHRISTENSEN, Conservator of the
Estate of CLARENCE B. NEIDIGH, a protected
person,

        Plaintiff and Appellant,

    -vs-

DOROTHY BRITTON, JOYCE LANGE, and
DEBBIE McSHANE,

        Defendants and Respondents.

APPEAL FROM: District Court of the Eighth Judicial District,
             In and for the County of Cascade,
             The Honorable Joel G. Roth, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Michael W. Cotter, Cotter & Cotter, Great Falls,
        Montana

    For Respondent:

        Dirk Larsen; Larsen & Neill, Great Falls, Montana

Submitted on Briefs: Sept. 15, 1989

Decided: December 28, 1989

Filed:

_Clerk_

Justice R. C. McDonough delivered the Opinion of the Court.

This is an appeal from an action to recover real and personal property that Clarence Neidigh gave to defendants Dorothy Britton, Joyce Lange and Debbie McShane (sometimes collectively referred to as "Defendants"). Rose Christensen, later appointed conservator of the estate of Clarence Neidigh, brought this action for damages and to set aside certain transfers on the grounds that Clarence Neidigh was incompetent and the transactions were a result of undue influence. The District Court of the Eighth Judicial District, sitting without a jury, found that the transactions between Clarence Neidigh, who was found to be competent, and the Defendants, were fair and regular. We reverse, remand and order the trial court to conduct a new trial to determine damages.

The issue in this case is:

Whether the District Court erred in concluding that the various transactions between Clarence Neidigh and the Defendants were valid.

Clarence Neidigh (Lou) was born on January 15, 1900. In 1929, he married Marie and had two children, Rose, and Dwight. Lou and Marie were married for 57 years. During this period of time, they enjoyed a very close and loving relationship. According to testimony, Lou and his wife were inseparable. They went everywhere together and he relied on her exclusively, for all of his needs. Marie died on September 14, 1986. Lou was extremely distraught over the loss of his wife. His neighbors described him as a "lost soul" during the months following the death.

The Defendants, Dorothy Britton, Debbie McShane and Joyce Lange, all knew Lou and Marie very well. Britton and McShane, who are daughters of Lange, grew up within a block

2

of Lou. Consequently, they enjoyed a very close relationship with him for about 25 years before his wife died.

After Marie died, Britton began spending an inordinate amount of time with Lou. She helped him with his day to day activities, such as driving him to the store and fixing his meals. In October, approximately one month after Marie's death, Britton contacted her family attorney. She asked him to prepare a power of attorney, giving her full control over all of Lou's assets. She maintained that this was necessary, because Lou was unable to handle his business affairs due to his depression over his wife's death and because his eyesight was very poor. Accordingly, on October 20, 1986, Britton took Lou to her attorney's office and he signed a durable power of attorney giving her full and complete control over his property.

On February 4, 1987, Britton took Lou to see her attorney for a second time. The purpose of this visit was for Lou to make a new will. According to Britton's testimony, Lou wanted to make a new will in order to leave the bulk of his estate to her, her mother and her sister. It was also decided that Lou would deed his house and all of its contents to Britton through an immediate transfer. Lou executed a warranty deed and conveyed his house and all of "the furniture, furnishings and equipment located therein" to Dorothy Britton. The house was fully paid for and there was no consideration paid to Lou for the home or the furnishings.

A number of monetary transactions then took place between Lou and the Defendants, most of which were in 1987. They included a $5,000.00 loan to Joyce Lange, a $4,000.00 loan to Rudette Mattingly (Dorothy Britton's sister), a $2,500.00 loan to Debbie McShane and a gift of a diamond ring, valued at $1,500, to Joyce Lange.

3

Most of these loans have never been repaid. Lange maintains, however, that she has repaid her $5,000.00 loan. She asserts that the loan was repaid by returning to Lou a gun collection which he had previously given to her. Each of these loans and their purported repayments were cash transactions. No promissory notes were every drafted, nor did the Defendants keep records of any repayment. The loans were usually accomplished by Lou making out a check to "cash." The Defendants would then drive him to the bank where he would cash the check and give them the money.

In October of 1987, Lou gave Britton his 1982 Ford LTD, which was valued at $3,800.00. Britton used the car for 13 days. She then sold the car back to Lou for $6,000.00. A receipt evidencing this sale was executed by both Lou and Britton.

During this period of time Lou met a young woman named Kim Stevens. Kim was 24 years old when she was introduced to Lou. Apparently Kim was a close friend of Defendant, Debbie McShane. Kim had three children and was, at this time, involved with a man by the name of Leland LaPier, who is currently incarcerated at the Montana State Prison.

A short time after they met, Lou and Kim were married on October 23, 1987. She moved herself and her three children into the home which Lou had previously deeded to Dorothy Britton. Debbie McShane also moved into the house with Kim and Lou.

Lou, no longer having any furniture and appliances in the house, bought furniture and appliances. He obtained many of the items that he needed by repurchasing some that he had given to Dorothy Britton. Among other things, he repurchased from her, his bed for $600.00 and his washer and dryer for $700.00.

4

In December of 1987, animosity began to develop between Lou and the Defendants. Britton's testimony is that the animosity arose after Lou's marriage to Kim. Eventually Britton asked Lou to leave the house. As a result Lou was forced to leave the home that he had occupied for over thirty years. He was not allowed to take any of his personal possessions because, as stated earlier, these had been conveyed to Britton. Following Lou's departure Britton began renting the house to her sister, Debbie McShane, for $342.00 a month.

Lou's son, Dwight, died in January of 1988. At the funeral Lou's daughter, Rose, discovered that he was out of money and was no longer in possession of his home or his belongings. Consequently, she moved him into her home in Helena. In February, after she was appointed conservator of her father's estate, she cashed out his bank account. He had only $800.00 left.

When Lou's wife died, his checking account contained between $45,000 and $50,000. He also had an income of approximately $1,500.00 a month which was obtained through retirement benefits and stock dividends. The total depletion of his cash assets between September of 1986 and February of 1988 was in an amount between $69,000 and $74,000. Additionally, he lost his home and virtually all of his personal possessions.

Lou's marriage to Kim was annulled in June of 1988. In the stipulation to annul the marriage, Kim stated her belief that "other parties set up and fraudulently induced the marriage relationship." Following the annulment Kim returned all of Lou's property that was in her possession.

Rose Christensen, as Conservator of the Estate of Lou Neidigh, brought this action to recover the property given to Dorothy Britton, Joyce Lange and Debbie McShane. After a

5

bench trial, the District Court held that the various gifts and transactions between Lou and the Defendants were valid. The court further concluded that the Defendants did not exercise undue influence over Lou and Lou was competent at the time of the transactions. Judgment was therefore entered in their favor. From this judgment, the plaintiff appeals.

The plaintiff advances two theories, either of which if proven would operate to invalidate the transfers of property by Lou Neidigh to the Defendants. She maintains that either Lou lacked the capacity necessary to make a valid gift or, in the alternative, that the gifts were obtained through the use of undue influence. The evidence does not support her claim that Lou lacked the capacity to make a valid gift. In fact Lou's doctor testified to his belief that Lou did have the mental capacity to understand and manage his financial affairs at the time the transfers were made. We, therefore, will examine the appellant's claim that the gifts were obtained through the use of undue influence.

Proof of undue influence does not depend upon a showing of mental incapacity on the part of the donor. In re Estate of Aageson (1985), 217 Mont. 78, 702 P.2d 338. Undue influence is never presumed and must be proven like any other fact. Adams v. Allen (1984), 209 Mont. 149, 679 P.2d 1232. Therefore, we must review the evidence to determine whether the plaintiff has carried her burden of proving that the gifts were a product of the Defendants' use of undue influence.

In Montana, the question of whether undue influence was exercised on a donor making a gift is determined by the same criteria used in deciding whether undue influence was exercised on a testator making a will. Cameron v. Cameron (1978), 179 Mont. 219, 587 P.2d 939. These criteria, as set out in Montana case law, are:

6

(1)  Confidential  relationship  of  the  person attempting to influence the testator;

(2)  The  physical  condition  of  the  testator  as  it affects his ability to withstand influence;

(3)  The  mental  condition  of  the  testator  as  it affects  his  ability  to  withstand  the  influence;

(4)  The  unnaturalness  of  the  disposition  as  it relates  to  showing  an  unbalanced  mind  or  a  mind easily  susceptible  to  undue  influence,  and

(5)  The  demands  and  importunities  as  they  may affect  the  particular  donor  taking  into consideration  the  time,  the  place,  and  all  the surrounding  circumstances.

Cameron, 587 P.2d at 945, see also § 28-2-407, MCA.

To  prove  an  assertion  of  undue  influence  one  must satisfy  each  of  these  criteria.   We  therefore  apply  the evidence to each of the five points.

There  was  a  close  confidential  relationship  between  Lou Neidigh  and  Dorothy  Britton.   Before  the  death  of  Lou's  wife, Britton  had  known  Lou  for  approximately  25  years.   According to  her  testimony,  she  thought  of  Lou  as  a  "grandfather." Within  five  weeks  after  Lou's  wife  died,  however,  this relationship  began  to  change.   Britton  then  took  on  the  added responsibility  of  controlling  and  managing  Lou's  financial affairs  by  obtaining  power  of  attorney  over  his  entire estate.   This  blanket  power  of  attorney,  which  was  obtained through  Britton's  lawyer,  imposed  upon  her  a  fiduciary  duty to  act  in  the  utmost  good  faith  when  dealing  with  Lou's financial  affairs.   This  fiduciary  duty,  together  with  her long  personal  relationship  with  him,  demonstrates  that Britton  had  a  confidential  relationship  with  Lou  Neidigh.

Due  to  Lou's  advanced  years,  his  physical  condition  was deteriorating  at  the  time  he  engaged  in  the  transactions  on review.   Testimony  revealed  that  his  sight  had  deteriorated

7

to the point of near blindness. In order to read, he needed a magnifying glass. This poor eyesight required him to become dependent upon others to write his checks and review his bank records. This dependency, in turn, made him susceptible to overreaching influence asserted by the Defendants.

Lou was also in a precarious mental state during the time the gifts and the loans were made to the Defendants. As we have previously mentioned, Marie Neidigh, Lou's wife, died on September 14, 1986. Lou took the death very hard. Witnesses at trial described him as a "lost soul" and testified that he would often cry in front of them. As can be expected, after the loss of a longtime spouse, Lou was sad, dependent, confused and lonely.

His dispositions were unnatural and indicate that he was in a weakened emotional state and was therefore easily susceptible to undue influence. Very shortly after Marie's death, Lou gave Joyce Lange, Marie's wedding rings. Following this gift a number of other unnatural transactions occurred between Lou and the Defendants. He gave his house and all of its contents to Dorothy Britton. In making this transaction, he did not even reserve to himself a life estate which would insure that he had a place to live. Additionally, a number of loans were made to the Defendants. These loans and their repayment were all purported to be in cash. No records were kept of their repayment and no promissory notes were ever signed by the Defendants. The sum of these loans approximated at least $12,000.00.

In addition to conveying all of the property contained in his house to Britton, Lou also gave her his only car. Thirteen days after this gift was made, Britton sold the car back to Lou for $6,000.00, which was $2,200.00 more than its fair market value. When Lou asked that other items of his

8

personal property be returned, Britton sold them to him. For instance, she sold him his washer and dryer for $700.00, his snowblower for $100.00, and his bedroom furniture for $600.00.

In December of 1987, after her relationship with Lou began to deteriorate, Dorothy Britton forced Lou to leave the house that he owned for over 30 years. When he left, he was not allowed to take any of his personal effects. Shortly after his departure, Britton rented the house to her sister for $342.00 a month.

The only conclusion that can be drawn from these transactions is that they were unnatural and were the product of an unbalanced mind or one that was easily susceptible to influence. We point out that in addition to losing his home and most of his personal property, Lou's monetary loss approximated somewhere between $69,000-$74,000. The Defendants, therefore, gained over $100,000 through their dealings with Lou.

As a final consideration in our examination of undue influence, we must look at the demands made by the Defendants as they may have affected Lou. Due to his weakened physical and emotional state, Lou was highly susceptible to influence exerted by the Defendants. Moreover, the manner in which the various transactions took place is highly suspect.

Dorothy Britton took Lou to her attorney on two occasions. On the first occasion she obtained blanket power of attorney over his entire estate. On the second occasion, she obtained a warranty deed to his house and all of its contents. The appointments for both of these meetings were made by Dorothy Britton. She accompanied Lou to these meetings and sat in with Lou while he spoke with the attorney. This afforded her a unique opportunity to influence the disposition of Lou's property.

We also note that the power of attorney, conferred upon Britton the duty to act in the utmost good faith in any financial dealings with Lou. This fiduciary duty was breached in a number of ways. In support of this conclusion we make reference to the facts that Britton allowed Lou to make improvident loans to her family members and that after obtaining title to his property she embarked on a course of selling it back to him.

The five criteria necessary to support the conclusion of undue influence have been met and the burden now shifts to the Defendants to prove that the transactions were fair and voluntary. 29 Am.Jur 2d, Evidence § 128. Defendants advance a number of arguments in support of their position that the transactions were valid. We find little merit to any of these arguments.

When Britton brought Lou to her attorney to make a new will, she obtained a statement from his doctor which stated that Lou was competent. We have no argument with this assertion. However, we point out that the fact that Lou was competent has no bearing on his susceptibility to undue influence. One does not need to be incompetent in order to be subject to overreaching influence. In re Estate of Aageson (1985), 217 Mont. 78, 702 P.2d 338. We note that this same doctor testified that the dispositions made by Lou were not natural.

The Defendants also presented testimony which indicated that Lou's children knew that he was going to give his house to Dorothy Britton. The testimony on this issue is conflicting, but at least one witness for the defense testified that Lou told his children of his desire to make this gift at a Christmas party in 1986. Assuming this testimony is true, we do not find that it has any relevance to the issue of undue influence. Even though Lou's children

may have known of Lou's intent, there is no evidence that they knew it was done and that he may later be forced to leave his house. Nor is there any evidence that they knew of the extensive drain on his financial resources.

Finally, the Defendants presented evidence of their close relationship with Lou Neidigh. Dorothy Britton testified that Lou was "like a grandfather" to her. Another witness testified that Lou stated that Britton was more of a daughter to him than his own. This close relationship, it is maintained, indicates that the gifts were made as a result of Lou's desire to show his love for the Defendants and were not, therefore, a product of undue influence. Britton's actions, however, speak louder than any of this testimony. As a matter of common human experience, we find it hard to comprehend how one could at the same time think of another person as a "grandfather" and then evict him from his own house.

Britton maintains that Lou's removal from the house and the subsequent sales of property to him resulted from her desire to protect the assets after his marriage to Kim Stevens. In view of the overall actions of Britton, we reject this argument. Lou married Kim on October 23, 1987. By this time Britton had obtained ownership of his house, his car and other possessions. His monetary worth had decreased by over $20,000.00. We also point out that upon the filing of this lawsuit, only one Defendant returned Lou's property. That defendant was Kim Stevens.

The facts of this case paint a vivid picture of unfair advantage and undue influence over an elderly and depressed man. We are, therefore, obligated to reverse. We do not take lightly the fact that we are reversing the findings of a court sitting without a jury. However, as we have stated on many occasions, the findings of a court sitting without a

11

jury must be based upon substantial evidence. Cameron v. Cameron (1978), 179 Mont. 219, 587 P.2d 939.

Substantial evidence is defined as that evidence that a reasonable mind might accept as adequate to support a conclusion. Blacks Law Dictionary 1281 (5th ed. 1979). Although it may be based upon weak and conflicting evidence, in order to rise to the level of substantial evidence it must be greater than trifling or frivolous. If a lower court's findings are not based upon substantial evidence and there is a clear preponderance of evidence against them, we must reverse. Taylor v. Pretranek (1977), 173 Mont. 433, 568 P.2d 120.

The evidence in this case, taken as a whole, of undue influence is overwhelming. Three women, within a time period of fifteen months, stripped Lou Neidigh of his house, his car, virtually all of his personal belongings, and over $40,000 in savings. The Defendants' evidence, in essence, is that these were gifts, freely given, as a result of Mr. Neidigh's love and affection. The extent of the gifts and the Defendants' course of conduct, however, belies these contentions and does not, therefore, rise to the level of substantial evidence. There is a clear preponderance of evidence against the findings of the trial court. As a result, we must reverse, remand and order further consideration consistent with this opinion.

_____
Justice

We concur:

_____
Chief Justice

12

_John Conway Harrison_

_Diane G. Barz_

_John C. Sheehy_

_____

Justices

Justice Fred J. Weber dissents.

In reversing the District Court, this Court has become the finder of fact, which is appropriate only in limited circumstances which do not apply here. Rule 52(a), M.R.Civ.P., states that a district court's findings of fact shall not be set aside unless "clearly erroneous," and that "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." In Parker v. Elder (Mont. 1988), 758 P.2d 292, 293, 45 St.Rep. 1305, 1307, this Court pointed out that if substantial credible evidence supports the findings, they are not clearly erroneous.

The majority concluded there were inequities in the transfers by an elderly man and have set aside the District Court's findings. The majority analyzes the evidence and sets forth its own findings of fact. The majority opinion does not analyze the findings of fact and the supporting evidence as determined by the District Court.

The District Court pointed out that the plaintiff called five witnesses and the defendants called six witnesses. With regard to the transfer of the house, the District Court found:

> 8. On February 4, 1987, Dorothy took Clarence to Robert Clary's law office where Clarence told Robert Clary that wanted to prepare his Last Will and Testament. He told Robert F. Clary, Jr. that he wanted to leave his house, his automobile and the contents of the house to Dorothy Britton. After some discussion, Clarence B. Neidigh decided that because his own children, Dwight Neidigh and Rose Christensen, might contest such a provision in his will, he instructed Robert F. Clary, Jr. to prepare a deed of the house of the house and its contents to Dorothy Britton as he wished to make to

14

her an immediate gift of this property to avoid any future will contests . . .

With further regard to the transfer of the house, the District Court found:

9. Following the transfer of the house to Dorothy, Clarence continued to live in the house until November or December 1987 when he moved to another house he had purchased. In connection with the deed of the house to Dorothy, there was an oral understanding between Clarence and Dorothy that Clarence could stay in the house as long as he wanted to so long as he paid the taxes and maintenance on the house . . .

With regard to the issue of duress and undue influence, the final finding of fact by the District Court was:

19. Although Clarence now wants his property to him the court finds that the evidence presented does not establish that Clarence's decisions with respect to his financial affairs and property interests were made under duress or undue influence. The evidence preponderates in favor of finding that Clarence made his own decisions and knew what he was doing at those times. His property disposition decisions may have been unwise. Clarence himself did not testify that he was coerced or under undue influence from anyone when he made the gifts of his property and when he married Kim Stevens. (Emphasis supplied.)

The District Court then made the following conclusions of law which have elements of factual findings in them:

2. Clarence B. Neidigh made a valid gift by deed of his house together with the furniture, furnishings and equipment located therein to Dorothy Britton on February 10, 1987. . .

3. The various transactions between Clarence B. Neidigh and Dorothy Britton whereby she sold to him a 1982 Ford, household furnishings and guns were fair and regular.

15

. . .

5. The loans made by Clarence B. Neidigh to Dorothy Britton and Joyce Langie [sic] have been repaid in full and there remains no balance due to Clarence B. Neidigh on thse [sic] loans.

6. There is _no_ _evidence_ that the gift made by deed from Clarence B. Neidigh to Dorothy Britton was obtained through duress or undue influence. (Emphasis supplied.)

While the record does contain substantial evidence in support of the findings set forth in the majority opinion, the record also contains substantial evidence to support the findings of the District Court. It is interesting to note that the district judge specifically found that a reason for the transfer of the real property was to prevent will contests and an attempt to obtain the property by his children. The record demonstrates that it is Rose Christensen, one of those two children who has acted as the plaintiff.

I conclude there is substantial credible evidence to support the findings of the District Court, and this should be the end of the inquiry. I would affirm the District Court.

_____
Justice

Justice William E. Hunt, Sr., joins in the foregoing dissent of Justice Fred J. Weber.

_____
Justice

16