No. 99-618

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 92

IN RE THE ESTATE OF

DANIEL G. BRADSHAW,

Deceased.

APPEAL FROM: District Court of the Fourth Judicial District,

In and for the County of Missoula,

The Honorable Ed McLean, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Scott B. Spencer, Attorney at Law, Libby, Montana

For Respondents:

James P. O'Brien; O'Brien Law Offices, Missoula, Montana

John C. Schulte; John Schulte Law Office, Missoula, Montana

Submitted on Briefs: October 19, 2000
Decided: May 24, 2001

Filed:

_____

Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1 The Fourth Judicial District Court, Missoula County, determined that Daniel G. Bradshaw (Daniel) died intestate and that his estate, including an annuity, will pass to his minor sons. Daniel's mother, Mary Bradshaw (Mary), appeals. We affirm.

¶2 We address the following dispositive issues:

¶3 1. Did the District Court err in concluding Mary was named the beneficiary of Daniel's annuity as a result of undue influence?

¶4 2. Did the District Court err in determining Daniel died intestate?

¶5 3. Did the District Court err in determining the beneficiaries of the constructive trust or in making other conclusions relating to Mary's status as constructive trustee of funds from Daniel's annuity?

## BACKGROUND

¶6 Daniel was twenty-seven years old when he committed suicide in Missoula, Montana, in October of 1996. He had been paralyzed on his left side as the result of a head injury in a wrestling accident during high school. The head injury and a lifelong learning disability also impaired Daniel's speaking ability, memory, and thinking. Following settlement of a lawsuit arising out of the wrestling accident, Daniel received annuity payments of $1,200 per month. The face value of the annuity payments, which continue for a total of 360 payments, is over $600,000. The annuity, Daniel's primary asset at the time of his death, is the focal point of this case.

¶7 After graduating from high school, Daniel moved from his family home in Kalispell, Montana, to Missoula, Montana, where he worked and bought a home. Daniel's survivors include two young sons, Danny, Jr., who was born in 1992, and Tristan, who was born in 1995. Daniel's marriage to Danny, Jr.'s mother was dissolved in 1994. *See Marriage of Bradshaw* (1995), 270 Mont. 222, 891 P.2d 506. Daniel was later engaged to marry Tristan's mother, but she broke the engagement. Daniel's other survivors (his "family of origin") are his parents, a sister, a brother, three nephews and a niece.

¶8 After Daniel's death, Tristan's mother petitioned the District Court to appoint her as the personal representative of his estate and to determine that he died intestate, leaving Danny, Jr., and Tristan as his heirs. Danny, Jr.'s mother also sought appointment as personal representative or, in the alternative, as co-personal representative. Mary moved for an order declaring her the owner of Daniel's annuity, pursuant to his written instructions to the annuity company in November of 1996 that she was the beneficiary of the account. The District Court appointed Tristan's mother as Daniel's personal representative, recognized Danny, Jr.'s mother as an interested party, and placed Daniel's estate under supervised administration.

¶9 The District Court held a bench trial on Mary's claimed ownership of the annuity. It heard testimony from numerous witnesses, including Daniel's psychiatrist, divorce attorney and employment and parenting counselor; Mary; Bradshaw's sister; four of Bradshaw's neighbors in Missoula; friends of Mary's from Kalispell; and both Danny, Jr.'s and Tristan's mothers.

¶10 The District Court entered extensive findings of fact, conclusions of law, and an order. The court concluded that Daniel died intestate and that he named Mary as the beneficiary of his annuity as a result of her undue influence. The court also concluded the disposition of all annuity benefits to Daniel's family of origin, as advocated by Mary, was unnatural given the evidence of how important Daniel's sons were to him. Determining Mary was a constructive trustee of the annuity but that she had failed in that role, the court removed Mary as constructive trustee and ordered Mary to transfer and deliver to Daniel's estate all property, funds and interest she had received from him or from the annuity and that all future payments on the annuity be paid to the estate to be expended on behalf of Daniel's sons. Mary appeals.

## STANDARD OF REVIEW

¶11 Section 3-2-204(5), MCA, and Rule 52(a), M.R.Civ.P., require that in equitable cases like this one, findings of fact must be upheld unless they are clearly erroneous. *Hansen v. 75 Ranch Co.*, 1998 MT 77, ¶ 20, 288 Mont. 310, ¶ 20, 957 P.2d 32, ¶ 20 (citation omitted). The first part of that inquiry is whether the findings are supported by substantial evidence. *Interstate Production Credit Ass'n v. DeSaye* (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287. The evidence is reviewed in the light most favorable to the prevailing party, and the credibility of witnesses and the weight assigned to their respective testimony are up to the trial court. *In re Guardianship of Mowrer*, 1999 MT 73, ¶ 36, 294

Mont. 35, ¶ 36, 979 P.2d 156, ¶ 36 (citation omitted). Further, our role in reviewing findings of fact is to determine whether the findings made are clearly erroneous; it is not to determine whether there is support in the evidence for findings which were not made. *See, e.g., Cenex Pipeline L.L.C. v. Fly Creek Angus, Inc.*, 1998 MT 334, ¶ 35, 292 Mont. 300, ¶ 35, 971 P.2d 781, ¶ 35.

## DISCUSSION

¶12 1. Did the District Court err in concluding Mary was named the beneficiary of Daniel's annuity as a result of undue influence?

¶13 Section 28-2-407, MCA, defines undue influence as:

> (1) the use by one in whom a confidence is reposed by another or who holds a real or apparent authority over him of such confidence or authority for the purpose of obtaining an unfair advantage over him;
>
> (2) taking an unfair advantage of another's weakness of mind; or
>
> (3) taking a grossly oppressive and unfair advantage of another's necessities or distress.

To determine whether there has been undue influence, a court examines: (1) any confidential relationship between the person alleged to be exercising undue influence and the donor; (2) the physical condition of the donor as it may affect his or her ability to withstand influence; (3) the mental condition of the donor as it may affect his or her ability to withstand influence; (4) the unnaturalness of the disposition as it relates to showing an unbalanced mind or a mind easily susceptible to influence; and (5) the demands and importunities as they may affect the donor, taking into account the time, place and surrounding circumstances. *Mowrer*, ¶ 31 (citations omitted).

¶14 The proper consideration and application of these five criteria have become muddled in some of our recent cases on undue influence. Beginning in *In re Maricich's Estate* (1965), 145 Mont. 146, 161, 400 P.2d 873, 881, we set forth the five criteria listed above as factors a court "may consider" in determining a question of undue influence. We continued that approach in *Cameron v. Cameron* (1978), 179 Mont. 219, 229, 587 P.2d 939, 945. In *In re Estate of Aageson* (1985), 217 Mont. 78, 85, 702 P.2d 338, 342, we strayed slightly from the above approach, saying a court "must consider" the five above

criteria.

¶15 Then, in *Christensen v. Britton* (1989), 240 Mont. 393, 398, 784 P.2d 908, 911, we cited *Cameron* in setting out the same five criteria. We went on to describe the standard for their consideration as one in which the proponent of the undue influence theory "must satisfy each of these criteria." *Christensen*, 240 Mont. at 398, 784 P.2d at 911. That description of the standard under which courts are to consider the criteria was not supported by any authority. Moreover, such an approach does not square with the alternative statutory definitions of undue influence set forth at § 28-2-407, MCA. We carried forward the erroneous and unsupported notion from *Christensen* that all five criteria must be satisfied to prove undue influence in *In re Estate of Luger* (1990), 244 Mont. 301, 304, 797 P.2d 229, 231; *Taylor v. Koslosky* (1991), 249 Mont. 215, 218, 814 P.2d 985, 987; *In re Estate of Jochems* (1992), 252 Mont. 24, 28, 826 P.2d 534, 535; *Flikkema v. Kimm* (1992), 255 Mont. 34, 40, 839 P.2d 1293, 1297; *In re Estate of Lien* (1995), 270 Mont. 295, 304, 892 P.2d 530, 535; *In re Estate of DeCock* (1996), 278 Mont. 437, 444-45, 925 P.2d 488, 492; *In re Estate of Lande*, 1999 MT 162, ¶ 42, 295 Mont. 160, ¶ 42, 983 P.2d 308, ¶ 42; and *Luke v. Gager*, 2000 MT 377, ¶ 35, 303 Mont. 474, ¶ 35, 16 P.3d 377, ¶ 35.

¶16 These statements, beginning in *Christensen* and ending in *Luke*, are overruled and we return to the standard expressed in *Cameron*: that a court may consider the five criteria in determining the existence of undue influence. The five criteria may, but need not, be present in any given undue influence case. The statutory requirements control. The five criteria are simply nonexclusive considerations available to guide the trial court in its application of the statutory requirements.

¶17 In determining that Mary's status as the beneficiary of the annuity was a result of undue influence, the District Court found all five criteria were present. Mary admits she had a confidential relationship with her son. As to the remaining four criteria, however, she disputes the court's determinations.

¶18 Mary contends there is no evidence in the record to support the court's determination that Daniel's physical and mental conditions made him susceptible to influence. In Conclusions of Law 7 and 8, the District Court determined:

> 7. The Decedent's physical condition affected his ability to withstand influence. The Decedent suffered from significant paralysis on his left arm and hand, a left-sided

limp, and his cognition and memory were impaired.

8. The Decedent suffered from various mental conditions including narcissistic personality disorder and organic explosive disorder. During his life he was significantly depressed and subject to suicidal ideation. The personality disorder resulted in an abnormal need to fulfill the requests and demands of his family of origin. He was susceptible to his mother's requests for assistance.

¶19 These "conclusions of law" might more properly be identified as findings of fact, and both are supported by the record. The record is uncontradicted that, as a result of his teenage wrestling accident, Daniel walked with a limp, had limited use of his left side, and suffered a speech impediment and thinking difficulties. The evidence also was uncontradicted that Daniel's intellectual performance was at the level of borderline mental retardation. Further, Daniel had been diagnosed with narcissistic personality disorder which made him susceptible to flattery, and with emotional dependency. He had a history of depression and attempted suicide. Larry Ginnings, Daniel's divorce attorney, testified Daniel was "child-like"-he could speak intelligently and could understand what was said to him, but "things didn't last with him. They kind of would slip his mind or he would think about something else and he would go on." On this record, the referenced "conclusions" are supported by substantial evidence.

¶20 Mary controverts the determination that Daniel's mental condition made him unable to withstand influence, pointing to testimony that he made his own decisions and was quite capable of saying "no." However, it is the District Court's job to weigh the evidence. *Mowrer*, ¶ 36. Moreover, our standard is to determine whether substantial evidence supports a trial court's findings, not to determine whether the evidence would support other findings. *DeSaye*, 250 Mont. at 323, 820 P.2d at 1287; *Cenex*, ¶ 35.

¶21 With regard to the fourth criterion considered in a claim of undue influence, the District Court concluded that "[t]he disposition of all annuity benefits to his family of origin, excluding his own minor children, is unnatural, particularly given how important his children were to him." Mary contends the disposition of Daniel's annuity to his family of origin is not unnatural and that the exclusion of his children may show that he was reacting against their mothers--his ex-partners--and that this is consistent with Daniel's self-focused personality.

¶22 The witnesses at trial unanimously attested to Daniel's love and commitment to his

firstborn son, Danny, Jr., and, later, to his younger son Tristan as well. Mary's friend Charlotte Wade testified that Daniel's children were "the most important thing" to him and that he "knew" his mother would make sure his children would have something from his annuity. Ginnings and, by deposition, Danny, Jr.'s mother, both testified that they understood Daniel named Mary as the beneficiary of the annuity under the belief that she would always take care of Danny, Jr. Dr. David Stube, Daniel's employment and parenting counselor, was asked if he could imagine Daniel intending to cut Danny, Jr., off from the annuity by making Mary its beneficiary. He responded that he "cannot see any reason why [Daniel] would not want his son to be part of his legacy, that heritage." This substantial evidence supports a conclusion that the disposition of the annuity to Daniel's family of origin was unnatural.

¶23 Mary further contends Conclusion 17, that it was not reasonable or credible to believe Daniel intended his sons to take only Social Security benefits, is "not relevant to undue influence." On the contrary, this conclusion also relates to the fourth criterion--unnaturalness of the disposition--in considering an undue influence claim.

¶24 The District Court did not make a conclusion or finding specifically identified as addressing the fifth undue influence criterion--the demands and importunities as they may affect the donor, taking into account the time, place and surrounding circumstances. The court did conclude, however, that

> Mary Bradshaw wrote the letter to the insurance company to name her as primary beneficiary of the annuity. The Decedent only signed the correspondence. In short, Mary Bradshaw wrote the letter naming herself as the primary beneficiary and procured the signature of Decedent. At the time Mary Bradshaw was named as primary beneficiary of the annuity, Decedent was engaged in a bitter divorce with Michele Ahern which made him more susceptible to the influence of Mary Bradshaw.

> In challenging this determination, Mary contends the idea of changing the beneficiary of the annuity came from Daniel's attorney during his divorce. She points to the absence of evidence that she had ever previously tried to be named beneficiary or that Daniel ever expressed a desire to change the beneficiary to anyone else.

¶25 As the District Court stated, the decision to name Mary as the beneficiary of the

annuity was made while Daniel was going through a bitter divorce from Danny, Jr.'s mother. Ginnings testified he was not a participant in the decision as to who the new beneficiary should be when the name of Danny, Jr.'s mother was removed. The record reflects that Mary was the only person who discussed with Daniel the idea that she be named as beneficiary of the annuity. Mary admitted she was the one who called the annuity company to make the change in beneficiary and that she drafted the letter changing the beneficiary of the annuity, which Daniel then signed. In short, the above conclusion is supported in the record as to its factual aspects.

¶26 Mary maintains, and correctly, that Daniel had every legal right to designate anyone he wanted as the beneficiary of his annuity, even if it meant disinheriting his children. This case hinges, however, on the believability of Mary's testimony that her borderline retarded son intended to disinherit his little boys from his annuity in favor of his family of origin. The District Court found her testimony incredible, and credibility determinations are solely within a trial court's province. *See Mowrer*, ¶ 36. The District Court ultimately found and concluded:

> Mary Bradshaw . . . was able to overcome Dan's desire to provide for his children by telling him that Social Security would provide for [them]. This was done to the detriment of Danny, Jr., and Tristan and did not constitute the true desire or intention of the Decedent.

> While Mary disputes this finding and conclusion, the record before us contains substantial evidence to support it.

¶27 We conclude the District Court correctly determined that each of the criterion for considering a claim of undue influence had been established. On that basis, we hold the District Court did not err in concluding that Mary was named the beneficiary of Daniel's annuity as a result of undue influence.

¶28 2. Did the District Court err in determining Daniel died intestate?

¶29 Mary contends Daniel executed a valid holographic will in 1988. In the 1988 document, which was introduced into evidence, Daniel left his vehicle to one of his nephews and the rest of his estate to be divided equally between his mother, his father, his brother and his sister.

¶30 The District Court found the 1988 document had not been submitted into evidence as a holographic will and, in addition, that it was unnecessary to determine whether that document was a will. While arguing at some length that the court erred in these regards, Mary also states that "[w]hether or not a will exists is mostly irrelevant to the resolution of this case." We agree.

¶31 Section 72-2-332, MCA, provides that the children of a decedent born after the making of a will who are not specifically provided for in the will take as if the decedent died intestate. Daniel's sons were born in 1992 and 1995. Thus, even assuming *arguendo* that Mary properly submitted the 1988 document as a holographic will and that it constituted a will, Danny, Jr., and Tristan are entitled to their shares of Daniel's estate as though he died intestate. Pursuant to § 72-2-113(1)(a), MCA, when, as here, an intestate decedent leaves no surviving spouse, the decedent's estate then passes to the decedent's descendants.

¶32 Alternatively, Mary contends notes Daniel wrote shortly before his death constitute a valid will when viewed in connection with the 1988 document. As to the notes, the court found:

> Notes left by [Daniel] written near the time of his suicide demonstrate that he was convinced that suicide was the only way out after having lost his employment. Additionally, those suicide notes indicated that his children were uppermost in his mind.

> The last of the notes left by [Daniel] were given to [Daniel's] family of origin by John and Colleen Montgomery. Subsequently, the notes were delivered to the Estate. The notes were altered sometime between when John and Colleen Montgomery transferred them to [Daniel's] family of origin and when delivered to the Estate. The notes were altered by his family of origin.

Given that Mary or another member of her family altered the notes Daniel wrote near the time of his suicide, they offered only a partial picture of Daniel's wishes, at best. The notes were not offered into evidence as a holographic will. The District Court weighed the notes under the circumstances of the case and Mary has not established an error in that regard.

¶33 Further, this Court generally will not address either an issue raised for the first time on appeal or a party's change in legal theory on appeal because "it is fundamentally unfair to

fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider." *Day v. Payne* (1996), 280 Mont. 273, 277, 929 P.2d 864, 866 (citation omitted). Inasmuch as Mary did not argue in the District Court that the suicide note taken together with the 1988 document constituted a valid will, we will not consider that argument.

¶34 We hold the District Court did not err in determining Daniel died intestate.

¶35 3. Did the District Court err in determining the beneficiaries of the constructive trust or in making other conclusions relating to Mary's status as constructive trustee of funds from Daniel's annuity?

¶36 A constructive trust arises when a person holds title to property subject to an equitable duty to convey that property to another because the person holding title would be unjustly enriched if permitted to retain it. Section 72-33-219, MCA. Mary admitted to the trial court that Daniel's annuity was placed in her name to hold in trust for the benefit of others. Her arguments relate to the identities of those for whom she held the annuity in trust and whether she violated her fiduciary duty as trustee.

¶37 Mary challenges four of the District Court's conclusions of law relating to constructive trust. Specifically, she challenges Conclusions 5, 12, 13 and 14:

> 5. . . . Mary Bradshaw was named primary beneficiary by the Decedent as a constructive trustee for the purposes of managing money received from the annuity for the benefit of his natural children, Danny, Jr., and Tristan.
>
> . . . .
>
> 12. Mary Bradshaw has violated her fiduciary obligation as the constructive trustee of funds received from the Decedent's annuity by refusing to acknowledge her role to expend the money received on behalf of the Decedent's minor children.
>
> 13. As constructive trustee, Mary Bradshaw was required to use her best efforts and reasonable care to ensure all needs of the Decedent's minor children were supplied.
>
> 14. Mary Bradshaw has failed in her role as a trustee of the funds by failing to observe, ascertain, or address the needs of the Decedent's minor children.

Mary's position at trial was that Daniel had named her as the beneficiary of the annuity with the expectation that she would distribute the annuity monies equally among herself, her husband, Daniel's brother and sister and his nephews and niece. She testified she had later decided to also give shares of the annuity to Danny, Jr., and Tristan, resulting in ten equal shares.

¶38 Mary's testimony about Daniel's wishes was contradicted by the testimony of numerous witnesses that Daniel named Mary as his beneficiary on the annuity with the idea that she would "take care of" his children. Mary characterizes this as "mere precatory language." While Mary points out that precatory language is insufficient, by itself, to impose a constructive trust in a will (*see In re Estate of Bolinger* (1997), 284 Mont. 114, 118-19, 943 P.2d 981, 986), the term is generally used in relation to wills. *See* Black's Law Dictionary 1176 (6th ed. 1990). As discussed above, Daniel left no valid will.

¶39 Mary asserts as to Conclusions 12, 13, and 14 that there is no evidence she breached a fiduciary duty, because no one claimed that either Danny, Jr., or Tristan had "gone without" during the pendency of this action. Such a claim was unnecessary. A trustee has the duty to administer the trust solely in the interests of its beneficiaries. Section 72-34-103 (1), MCA. By taking the original position that the annuity was to be distributed among various members of Daniel's family of origin and the later position that each of his sons was entitled to a mere one-tenth share, Mary failed to administer the trust solely in the interests of Danny, Jr., and Tristan.

¶40 The evidence discussed above as to the fourth criterion for undue influence supports a conclusion that Daniel's sons were properly the beneficiaries of the constructive trust. We hold that the District Court did not err in determining the beneficiaries of the constructive trust or in its other challenged conclusions relating to Mary's status as constructive trustee of funds from Daniel's annuity.

¶41 Given our holdings on the dispositive issues discussed above, we need not address the other findings of fact Mary challenges. To the extent those findings are unnecessary to resolution of the above issues, they are irrelevant to the ultimate outcome of this case. In addition, Mary's arguments that the District Court should have made several additional findings is not a function of our review on appeal. *See Cenex*, ¶ 35.

¶42 Affirmed.

/S/ KARLA M. GRAY

We concur:

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER