No. 00-106

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 377

303 Mont. 474

16 P. 3d 377

SALLY R. LUKE and JAMES

DOERING, Co-Personal Representatives

of the Estate of Margaret Louise Liddell,

Plaintiffs and Appellants,

v.

ALICE GAGER, and JOHN DOES 1 AND 2,

Defendants and Respondents.

APPEAL FROM: District Court of the Twentieth Judicial District,

In and for the County of Lake,

The Honorable Hon. C. B. McNeil, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Phillip J. Grainey (argued), French, Mercer, Grainey & O'Neill, Ronan,

Montana

James A. Manley (argued), Manley & O'Rourke-Mullins, Polson, Montana

For Respondents:

Erika L. Johnson (argued), Warden, Christiansen, Johnson & Berg, PLLP,

Kalispell, Montana

Argued and submitted: July 19, 2000
Decided: December 28, 2000

Filed:

_____

Clerk

Justice Jim Regnier delivered the opinion of the Court.

¶1 This is an appeal from a bench trial in the Twentieth Judicial District Court, Lake County. The Plaintiffs, Sally R. Luke and James Doering (hereinafter referred to as Luke), are the personal representatives of the estate of Margaret Louise Liddell (Maggie) and in such capacity bring this lawsuit against Alice Gager (Alice) and John Does 1 and 2, to recover damages for fraud, undue influence, conversion, constructive fraud, and breach of implied-in-law covenant of good faith and fair dealing. The matter was tried without a jury on October 21 and 22, 1999. On November 18, 1999, the District Court entered its findings of fact, conclusions of law and judgment in favor of the Luke, awarding damages in the sum of $5450. Luke appeals. We reverse the judgment of the District Court and remand this matter for a new trial.

¶2 There are three issues raised by this appeal:

¶3 1. Did the District Court err when it imposed the burden of proving undue influence on Luke?

¶4 2. Did the District Court err when it imposed the burden of proving constructive fraud on Luke?

¶5 3. Are the District Court's findings of fact and conclusions of law supported by substantial credible evidence?

# BACKGROUND

¶6 This case arises from transfers of Maggie Liddell's assets by her long-time companion and caretaker, defendant Alice Gager. Suit was originally filed by Sally Luke, as guardian and conservator for Maggie. Following Maggie's death in April 1999, Sally Luke and James Doering, as corepresentatives of Maggie's estate, were substituted as plaintiffs.

¶7 Maggie and her husband owned a tavern and café business in Dayton, Montana, and were long-time residents of the area, owning a lake front home near Dayton. Over the years, the couple accumulated assets from their business and from the sale of several lakeside lots. Maggie's husband passed away in the 1970s. During the same time period, her sister Ida, who had previously lived nearby in Plains, Montana, moved to Minnesota. The sisters maintained regular contact by telephone and letters. Maggie also had a niece, Sally Luke, in Helena, Montana, and a nephew, Jim Doering, in Dillon, Montana (both personal representatives herein). Although Maggie appeared to have a good relationship with her relatives, there were no family members within the Dayton area. Alice, Maggie's long-time friend, lived down the road from her.

¶8 In 1991 Maggie asked her sister, Ida and her friend, Alice to witness her execution of various estate planning documents, including a will, trust agreement, deed, bill of sale, bank signature card, and durable power of attorney. The will left the majority of her estate to her siblings, and named Ida as personal representative. In the same year, Maggie underwent a complete physical exam by her physician, Dr. Peter A. Philips, who found that she was of sound mind and body.

¶9 Over the next few years, Maggie's physical and mental condition began to deteriorate. She had respiratory problems, a chronic heart condition, diabetes, and other medical conditions. Maggie also consumed regular quantities of alcohol and smoked heavily. Alice began to visit Maggie on a daily basis, bringing her some meals and providing occasional transportation. Maggie became increasingly dependent on Alice for all of her needs. Over time, Alice began to handle Maggie's financial affairs, her mail, and write all of her correspondence. Alice testified that with Maggie's consent she signed Maggie's name on Maggie's personal checks.

¶10 In 1992 or 1993 Ida, who had a valid durable power of attorney, was visiting and learned that Alice had spent $800 of Maggie's money for tree removal. Ida requested that Alice not write checks for more than $100 without her approval. Ida testified that Alice

agreed to such an arrangement. From 1990 to 1998, however, Alice continued to manage Maggie's finances and spent large sums of Maggie's money, writing checks far in excess of $100.

¶11 In 1993 Alice brought Maggie to Dr. Philips for her annual physical. He diagnosed Maggie with senile dementia and other chronic health problems. Dr. Philips testified that Maggie had mental deterioration starting in 1993 or 1994, and by 1995 Maggie had significant mental deterioration. He further testified that by 1995 it was very unlikely that Maggie could manage her own finances. Dr. Philips also noted that Maggie's mental deterioration was progressive, with no specific point of mental incapacity-merely an on-going, progressive increase in mental senility. He testified that by 1996 she was totally incapable of caring for herself.

¶12 On January 1, 1995, Maggie was so disoriented, she walked to a Dayton tavern in her bathrobe. An employee at the tavern contacted Alice who came to the tavern and escorted Maggie to her home. Alice testified that Maggie was disoriented for the rest of the day. As of that day, Alice moved in with Maggie. Alice conceded that Maggie was mentally impaired at that point.

¶13 From this point forward Maggie was dependent on Alice for all of her needs, including travel, meals, all financial transactions, medicine, home care, hygiene, and contact with the outside world. Alice drafted all of Maggie's correspondence and answered her phone. Alice monitored all of Maggie's incoming mail. During a January 26, 1995, medical examination, Dr. Philips noted that Maggie was becoming more and more infantile, relying exclusively on Alice for her personal needs.

¶14 In February 1995, one month after she moved in, Alice called Maggie's bank and successfully transferred $209,955.59 from Maggie's money market account to Maggie's checking account, thus allowing Alice, who at this point was affixing Maggie's signature to her checks, increased access to Maggie's funds. In March 1995 Alice arranged the sale of Maggie's stock in Pacific Power Corp. and when the check in the amount of $15,917.10 arrived, endorsed Maggie's name and deposited the check into Alice's personal bank account in Anaconda, Montana. Then in July 1995 Alice arranged the liquidation of Maggie's D.A. Davidson stock account, and when the check in the amount of $20,138.49 arrived, signed Maggie's name to the check and deposited the money into Alice's bank account in Anaconda. Alice testified that these checks were gifts from Maggie.

¶15 Alice brought Maggie to the hospital and medical clinic several times during the next year. Health care workers generally found that Maggie continued to deteriorate both mentally and physically. Her physician advised Alice that Maggie needed home health care services. Instead, Alice continued to take Maggie on trips to see Alice's relatives, take her to gambling establishments, shopping, and dining out, completely financed by Alice writing checks from Maggie's checking account. It is unclear whether Maggie had the mental and physical capacity to enjoy such activities.

¶16 In April 1996 Alice arranged for Maggie to execute a power of attorney, naming Alice as attorney-in-fact, even though Maggie had already granted Ida a durable power of attorney. Alice contacted a different attorney than the one who had previously drafted estate planning documents for Maggie in 1991. Alice took Maggie to the attorney's office and instructed the attorney as to what should be included in the document. Maggie received no independent advice or representation, but did sign the papers granting Alice power of attorney in her own barely legible scrawl.

¶17 At the time the power of attorney was executed, Maggie still had over $178,000 in her checking account. Over the next two years, Alice wrote checks to herself, for cash, or for expenses not clearly benefitting Maggie, for over $135,000. Alice loaned her son $10,000 and paid off a debt for her granddaughter of over $5000. During this time period, Alice also continued to pay for all of Maggie and Alice's daily expenses.

¶18 Maggie was hospitalized several times from 1996 to 1998 for pneumonia, heart failure, and other conditions, and she continued to generally deteriorate. Alice didn't notify Maggie's relatives concerning her failing health. Dr. Philips testified that by October 1996, Maggie was totally incapable of caring for herself, and that Alice could not adequately take care of her. Yet Alice continued to inform Maggie's family, by letter and telephone, that Maggie was in good health and everything was going well.

¶19 In July 1998, after several emergency room visits, Dr. Philips insisted that Maggie enter a nursing home. Alice resisted. Finally, Alice placed Maggie in the Evergreen Nursing Home which was an appropriate facility. Alice didn't notify Maggie's relatives of the move. Approximately $31,000 remained in Maggie's checking account. Between June 30 and August 8, 1998, Alice withdrew $30,350 in cash from the account.

¶20 On August 1, 1998, against physician's advice, Alice used her power of attorney and removed Maggie from the full-care Evergreen facility and placed her in a partial care

facility closer to Dayton. Shortly thereafter, Maggie was twice hospitalized. Dr. Philips reiterated that Maggie required the services of a full care facility, but his advice fell on deaf ears. Finally, Alice arranged for Maggie to be placed in a local nursing home. Alice continued to deplete Maggie's account until there was no money left.

¶21 During this time, Alice apparently held approximately $25,000 in cash which had been previously withdrawn from Maggie's account. In early September she deposited $3000 back into the account to pay the monthly nursing home bill. In late September she also deposited additional cash back into the account to pay another nursing home bill.

¶22 In October 1998 Maggie's relatives finally discovered that Maggie was residing in a nursing home. Her sister, Ida and niece, Sally Luke, visited Maggie in the nursing home and planned to stay at Maggie's Dayton residence. Upon arriving at the home, they discovered that the residence was extremely unsanitary and in disrepair. They arranged to meet with Alice to discuss Maggie's care. Alice arrived several hours late for the meeting, stating that she had a flat tire or had run out of gas. Later, Alice admitted that she had met with her attorney and deposited $20,000 cash back into Maggie's account.

¶23 From April 1996 through October 1998, Alice withdrew and expended over $178,000 from Maggie's account, including cash withdrawals of over $97,000.

¶24 Sally Luke filed a petition for conservatorship and guardianship, and was appointed as conservator and guardian on October 14, 1998. Maggie died at the nursing home on April 7, 1999. After Maggie's death, Sally Luke and Jim Doering were named copersonal representatives of Maggie's estate on April 26, 1999.

¶25 After filing this suit, Plaintiffs requested an accounting of the over $200,000 spent by Alice. Alice was unable to provide a meaningful response and only accounted for a small fraction of the withdrawals and expenditures. Alice attempted to justify the withdrawals by stating that she and Maggie spent the money together, that Maggie benefitted from the expenditures, and that the expenditures were what Maggie wanted.

¶26 In its findings of fact, conclusions of law and judgment, the District Court concluded that Maggie's mental capacity was not impaired to the extent that she could not make reasonable financial decisions. The District Court further concluded that the burden of proving undue influence is on the party claiming it and that the Plaintiffs failed in their burden of proving that the gifts Alice received from Maggie were the product of undue

influence. The District Court also concluded that the burden of proving constructive fraud is on the party claiming it and that the Plaintiffs failed in their burden of proving that the gifts that Alice received from Maggie were obtained by constructive fraud. Finally, the District Court concluded that during July and August 1998, while Maggie was in the hospital and nursing homes, Alice withdrew $25,450 from Maggie's account without authorization and approval. The District Court found that in September 1998 Alice redeposited $20,000 into Maggie's account. Thus, the District Court concluded that Alice unlawfully converted a total of $5450 for her own benefit. Luke appeals.

## STANDARD OF REVIEW

¶27 The standard of review of a district court's finding of fact is whether they are clearly erroneous. The standard of review of a district court's conclusion of law is whether the court's interpretation of the law is correct. *City of Bozeman on Behalf of Dep't of Transp. of State of Mont. v. Vaniman* (1995), 271 Mont. 514, 517, 898 P.2d 1208, 1210. In considering whether a finding is clearly erroneous, we determine whether a finding is supported by substantial evidence, whether the court correctly apprehended the evidence, or, despite satisfaction of those two elements, whether the reviewing court is of firm conviction that a mistake has been made. *Vaniman*, 271 Mont. at 517, 898 P.2d at 1210.

## ISSUE ONE

¶28 Did the District Court err when it imposed the burden of proving undue influence on Luke?

¶29 Luke argues that the District Court erred when it assigned the burden of proving undue influence on the Plaintiffs rather than the Defendant. The District Court's conclusion of law No. 4 clearly states that the obligation of proving undue influence in this case rested with Luke. Thus, if the District Court mistakenly imposed the burden on the Plaintiffs, as Luke urges, we must reverse and remand this case to the District Court for a new trial. Such an error would be systemic and pervasive to the entire proceeding.

¶30 Luke argues that "gifts" given to Alice from Maggie were the product of undue influence. Luke further argues that Alice's procurement of the power of attorney was by undue influence, and that Alice did not act lawfully as Maggie's attorney-in-fact. Luke further contends that although the burden of proof in an undue influence case generally rests with the plaintiff, the burden shifts to the defendant if such defendant is in a position

of power and trust and benefits from his actions.

¶31 Alice argues that Montana's law of undue influence is settled, that the burden of proof rests with the plaintiff and that Luke provides no convincing arguments for shifting the burden of proof in this case. She also argues that the District Court correctly found no undue influence and that monies expended were either for Maggie's direct benefit or gifts to Alice.

¶32 In its conclusions of law the District Court ruled that the burden of proving of undue influence is on the party claiming it; in this case Luke. The District Court then concluded that Luke failed in her burden to prove that the financial transactions orchestrated by Alice were the product of undue influence.

¶33 The District Court correctly concluded that the burden of proof is generally on the party who is claiming undue influence. Undue influence is never presumed and must be proven like any other fact. *Christensen v. Britton* (1989), 240 Mont. 393, 397-98, 784 P.2d 908, 911. The plaintiff typically bears the burden of proving undue influence. *See, e.g. Adams v. Allen* (1984), 209 Mont. 149, 155-56, 679 P.2d 1232, 1236.

¶34 The question of whether undue influence was exercised on a donor making a gift is determined by the same criteria used in deciding whether undue influence was exercised on a testator making a will. *Christensen*, 240 Mont. at 398, 784 P.2d at 911. These criteria, as set out in Montana case law, are:

(1) Confidential relationship of the person attempting to influence the testator;

(2) The physical condition of the testator as it affects his ability to withstand influence;

(3) The mental condition of the testator as it affects his ability to withstand the influence;

(4) The unnaturalness of the disposition as it relates to showing an unbalanced mind or a mind easily susceptible to undue influence; and

(5) The demands and importunities as they may affect the particular donor taking into consideration the time, the place, and all the surrounding circumstances.

*Christensen,* 240 Mont. at 398, 784 P.2d at 911.

¶35 To prove an assertion of undue influence, the plaintiff must satisfy each of these criteria. If the plaintiff satisfies each of the above criteria, however, the burden then shifts to the defendant to prove that the transactions were fair and voluntary. *Christensen,* 240 Mont. at 400, 784 P.2d at 913. We therefore consider the evidence presented to the District Court as it relates to each of the five criteria to determine whether the District Court's conclusion regarding the burden of proof is erroneous.

### A. Confidentiality

¶36 There was certainly a close, confidential relationship between Alice and Maggie that spanned 30 years. Alice does not seriously dispute that such a relationship existed. Prior to Maggie's physical and mental decline, Alice brought meals over to her house and provided occasional transportation. After Maggie, in a disoriented state, wandered to the Dayton Tavern on New Year's Day in 1995, Alice and Maggie shared an extremely close relationship and lived together. Alice soon had full control over Maggie's finances and access to her bank accounts. Alice ultimately was appointed as Maggie's attorney in fact. She signed Maggie's name to checks and withdrew significant sums of money from Maggie's account. Alice essentially directed Maggie's contact with her family. Alice authored all of Maggie's correspondence and answered her telephone. She also took exclusive care of Maggie's health and personal hygiene, providing for her basic daily needs.

### B. Physical Condition

¶37 During the period in question, Maggie's physical condition was precarious and she did not have the stamina to resist Alice's influence. Maggie suffered from pneumonia, a serious heart condition, and constant respiratory deficiency. Maggie was essentially totally dependent on Alice for her physical well-being. From January 1995 until April 1996, Maggie had progressively deteriorating and chronic health problems and was hospitalized several times. She generally ate very little, may have been somewhat malnourished, and used oxygen to facilitate breathing. She was generally unable to care for herself, and required daily assistance to take medications and for her personal hygiene.

### C. Mental Condition

¶38 During the time when these transactions occurred, Maggie's mental state was, at a minimum, significantly compromised. She was consistently diagnosed with some level of senile dementia. Proof of undue influence does not necessarily depend upon a showing of mental incapacity on the part of the donor. *Christiansen*, 240 Mont. at 397, 784 P.2d at 911. *See also In re Aageson* (1985), 217 Mont. 78, 87, 702 P.2d 338, 343. In this case, however, it is uncontested that Maggie was mentally deteriorating during the entire period that Alice controlled her financial assets. Maggie's mental state was such that she could not withstand Alice's influence.

### D. Unnaturalness of the Disposition

¶39 Maggie's intended and natural disposition of her estate was demonstrated in the 1991 last will and testament as well as the accompanying estate planning documents. She left her entire estate to her siblings and a charitable trust. Essentially, Maggie's entire estate, with the exception of her home, was then dissipated during the period Alice had control of the checkbook.

### E. Surrounding Circumstances

¶40 All of the surrounding circumstances indicate that Maggie was easily influenced by her lifelong friend, Alice. She was physically isolated from her family and others in the community, and beholden to Alice to provide any interaction with others. Maggie was generally unwell, and relied on Alice for her medication, oxygen, visits to the hospital and doctors, and any other outing. The circumstances and Maggie's failing physical and mental health made Maggie extremely dependent on Alice, and extremely susceptible to undue influence exerted by her.

¶41 We conclude that the five criteria necessary to support a conclusion of undue influence have clearly been met in this case. The District Court erred by not shifting the burden to Alice to prove that the financial transactions benefitting Alice were fair and voluntary. *See Christensen*, 240 Mont. at 400, 784 P.2d at 913. Therefore, the proper remedy is to remand this matter for a new trial.

### ISSUE TWO

¶42 Did the District Court err when it imposed the burden of proving constructive fraud on Luke?

¶43 The Plaintiffs also argue that the District Court erred when it imposed the burden of proving constructive fraud on them rather than the Defendant. The District Court in its conclusion of law No. 5 clearly stated that the burden of proving constructive fraud is with the party claiming it, and that the Plaintiffs failed in their burden of proving that the gifts that Alice received from Maggie were obtained by constructive fraud.

¶44 Luke contends that, like undue influence, the burden of proof normally rests with the party asserting constructive fraud. However, Luke maintains that upon proof that an agency relationship existed, the burden then shifts to the agent who benefitted from the transaction to prove that the transaction was fair and equitable. Luke argues that because evidence demonstrates that an agency relationship existed between Maggie and Alice beginning in 1995, the District Court erred in requiring Plaintiffs to prove constructive fraud.

¶45 Alice responds that, even though she was Maggie's agent, the burden of proof for constructive fraud is on the party claiming it, and no statutory or common law exceptions exist to that rule. Alice further contends that the District Court properly assigned the burden of proof and correctly found that Luke did not prove constructive fraud.

¶46 As stated above, the assignment of the burden of proof dictates the entire presentation of evidence and even determines what evidence is marshaled and ultimately offered by the parties for consideration by the trier of fact. Failure to properly assign the burden of proof in most instances necessitates a new trial.

¶47 Luke argues that an agency relationship existed between Maggie and Alice. An agent is defined as "one who represents another, called the principal, in dealings with third persons." Section 28-10-101, MCA. An agency can be either actual or ostensible. Agency is actual when the agent is actually employed by the principal. An agency is ostensible when the principal intentionally or by want of ordinary care causes a third person to believe another to be his agent who is not actually employed by him. Section 28-10-103, MCA.

¶48 Luke argues that an agency relationship commenced in January 1995 when Alice moved in with Maggie, began writing out her checks, paying her bills, writing her letters, and essentially conducting her affairs. Then, on April 19, 1996, Maggie executed a power of attorney naming Alice as her attorney in fact. As stated above, Alice does not dispute that an agency relationship existed between her and Maggie.

¶49 As her agent, Alice owed Maggie all of the duties that an agent owes a principal. An agent has a statutory duty not to exceed actual authority, § 28-10-301, MCA, a duty to keep the principal informed, § 28-10-302, MCA, and a duty not to defraud the principal, § 28-10-409, MCA. In addition, an agent is bound by certain common law obligations of agency: loyalty and obedience. *State v. Fredrick* (1984), 208 Mont. 112, 118, 626 P.2d 213, 216.

¶50 Luke asserts that Alice is liable to Maggie's estate for constructive fraud committed in her fiduciary capacity. *See* § 28-2-406, MCA; *Local Union No. 400 of the Int'l Union of Operating Eng'rs v. Bosh* (1986), 220 Mont. 304, 312, 715 P.2d 36, 41. The general rule is that the burden of proving constructive fraud lies with the plaintiff. *Bengala v. Conservative Sav. Bank* (1991), 250 Mont. 101, 105-06, 818 P.2d 371, 373-74. Yet, if a fiduciary profits personally from the use of or the receipt of funds under his or her possession through an agency relationship, the burden of proof shifts to the fiduciary to show he or she acted reasonably. *See Bosh,* 220 Mont. at 312, 715 P.2d at 41; *Estate of Rogers* (1986), 223 Mont. 78, 83, 725 P.2d 544, 547; *Estate of Clark* (1989), 237 Mont. 179, 184-85, 772 P.2d 299, 302-03.

¶51 We have addressed such a burden shifting scheme in several cases. In *Bosh*, the union brought an action against the former business manager and officers seeking an accounting, reimbursement of misappropriated funds, and production of union files, alleging constructive fraud and wrongful conversion of property. We held in *Bosh* that jury instructions which stated that if a fiduciary profits personally from the use or receipt of union funds the burden shifts to the fiduciary to show he or she acted reasonably. *Bosh*, 220 Mont. at 312, 715 P.2d at 41.

¶52 This court also recognized the burden shifting rule in *Estate of Rogers* (1986), 223 Mont. 78, 725 P.2d 544, when we held that certain estate property was appropriately awarded to decedent's wife even after the burden of proof shifted and required her to show that the transfers of property were appropriate. The children argued that because the wife acted under the power of attorney, she was subject to the statutory provisions of agency law, specifically § 28-10-407(3), MCA, which provides that an agent is not authorized to do any act which a trustee is forbidden to do by Title 72, Chapter 20, Part 2, MCA. *Estate of Rogers*, 223 Mont. at 83, 725 P.2d at 547. We agreed that the wife was subject to the statutory provisions of agency law, but concluded that she had overcome her burden to show that the transfer of property was appropriate.

¶53 We analyzed *Rogers* in light of § 72-20-208, MCA, which has since been repealed. We noted that under § 72-20-208, MCA, all transactions between an agent and his or her principal during the existence of an agency relationship are presumed to be null and void, with some exceptions. One such exception is that an agent has the burden of proving in every case that the principal not only had the knowledge of the agent's action, but also the burden of showing that all information in possession of the agent had been communicated to the principal prior to the giving of consent. *See Rogers*, 223 Mont. at 83-84, 725 P.2d at 547. In *Rogers*, we found that there was ample evidence to prove an express and explicit agreement existed between the husband and wife that she have the property at issue, overcoming the burden of proof which had shifted to the defendant wife.

¶54 We also addressed the burden shifting issue in *Estate of Clark* (1989), 237 Mont. 179, 772 P.2d 299. In *Clark*, several children contested the actions of their brother who had been appointed as their parents' conservator. In regards to transactions which benefitted the conservator, we held, pursuant to § 70-20-208, MCA, that any transactions where the conservator obtained an advantage must be presumed to be without sufficient consideration and under undue influence, and that the conservator had the burden of proving that any transactions in which he gained an advantage were for the benefit of the protected persons and that the protected persons freely entered into the transactions with full knowledge of the facts. *Estate of Clark*, 237 Mont. at 185, 772 P.2d at 302-03. The Defendant argues that *Rogers* and *Clark* are no longer good law because the relevant statute has been repealed. We disagree.

¶55 Under our current statutory provision, an authority expressed in general terms still does not authorize an agent to do any act which a trustee is forbidden to do under Title 72, Chapter 34. Section 28-10-407, MCA. The existence of a formal trust is not necessary in requiring an agent to owe a duty no less than that of a trustee. *See Estate of Rogers*, 223 Mont. at 82-83, 725 P.2d at 546-47.

¶56 Title 72, Chapter 34 outlines the duties, powers, and liabilities of a trustee, including a duty of loyalty, a duty to avoid conflict of interest, and a duty to use ordinary skill and prudence. Although the revision of the Trust Code in 1989 did not reenact the specific statute cited in *Estate of Rogers* and *Estate of Clark*, pursuant to Montana law there continues to be a presumption of a violation of a trustee's duties when there is a transaction between the trustee and a beneficiary where the trustee obtains an advantage from the beneficiary. *See* § 72-34-105, MCA. Specifically:

> [A] transaction between the trustee and a beneficiary which occurs during the existence of the trust or while the trustee's influence with the beneficiary remains and by which the trustees obtains an advantage from the beneficiary is presumed to be a violation of the trustee's fiduciary duties. This presumption is a presumption affecting the burden of proof . . . .

Section 72-34-105(3), MCA. Thus, although the statutory scheme is not precisely the same today as when we decided *Estate of Rogers* and *Estate of Clark*, our fundamental holdings in those cases remain intact.

¶57 In the case at hand, evidence shows that an agency relationship existed as early as January 1995. Subsequently, Alice ostensibly benefitted from numerous transactions. Thus, the burden should have been shifted to Alice to show, by a preponderance of the evidence, that all transactions which benefitted her during the agency relationship, were fair and equitable and were not the result of a violation her duties as Maggie's agent. *See Bosh*, 200 Mont. at 312, 715 P.2d at 41. When an agent is under a duty to act reasonably, such a person also has the duty to keep proper accounts, and the burden of proving that he or she is entitled to the credit he or she claims. *Bosh*, 220 Mont. at 312, 715 P.2d at 41. *See also* 3 Am. Jur. 2d *Agency* § 348 (1986); 90 C.J.S. *Trusts* § 414 (1955). We conclude that the District Court erred when it imposed the burden of proof on the Plaintiff. Thus, we remand this issue for a new trial.

## ISSUE THREE

¶58 Are the District Court's findings of fact and conclusions of law supported by substantial credible evidence?

¶59 Luke argues that many of the District Court's findings of fact are not supported by substantial credible evidence, and specifically challenges four District Court findings of fact. Alice responds that substantial credible evidence exists to support all of the District Court's findings of fact.

¶60 Because we reverse and remand to the District Court for a new trial, we need not reach the issue of whether these particular findings of fact are supported by credible evidence.

¶61 Additionally, Alice argues that the requests for admission, which were not responded

to by Alice before trial and subsequently moved for admission by Luke, were impermissibly admitted under Rule 36(b), M.R.Civ.P., during trial. Yet, Alice failed to raise any objections to the admission of the requests at trial. We note that Alice did not request an extension of time to file answers to the requests pursuant to Rule 36(a) at any time prior to trial. Plaintiffs further argue that Alice did not object at the time of entry and, therefore, has not preserved her claim. *See Holmes & Turner v. Steer-In* (1986), 222 Mont. 282, 284-85, 721 P.2d 1276, 1278. Finally, we also note that Alice has not cross-appealed this issue. Rule 2, M.R.App.P.

¶62 Alice argues that Luke failed to formally request the District Court to take the disputed admissions into consideration when submitting proposed findings of fact, conclusions of law and judgment, therefore essentially waiving any legal impact of the admissions and relying instead on theevidence presented.

¶63 Since both sides make persuasive waiver arguments on the issue and this matter is being remanded for a new trial, we decline to address this question.

## CONCLUSION

¶64 The facts of this case are not easy ones. Clearly Maggie was dependent upon Alice, and Alice appeared to do her best to care for her ailing friend. Yet, it is also clear that Alice was in a position to take advantage of the close and confidential relationship to support her own lifestyle and gain financially. We conclude that the District Court improperly assigned the burden of proof to Luke in the two critical causes of action, undue influence and constructive fraud. This error requires a new trial where both sides are again given an opportunity to fully present evidence under proper procedural rules. Reversed.

/S/ JIM REGNIER

We Concur:

/S/ J. A. TURNAGE

/S/ JAMES C. NELSON

/S/ TERRY N. TRIEWEILER

/S/ W. WILLIAM LEAPHART

Justice William E. Hunt, Sr., dissents.

¶65 The majority correctly expresses our standard of review, but fails to apply it. Absent a determination that the District Court's findings are clearly erroneous, they will not be set aside. In re Estate of Tipp (1997), 281 Mont. 120, 123, 933 P.2d 182, 184. The evidence is reviewed in the light most favorable to the prevailing party, and the credibility of witnesses and the weight assigned to their testimony is for the determination of the District Court. In re Guardianship of Mowrer, 1999 MT 73, ¶ 36, 294 Mont. 35, ¶ 36, 979 P.2d 156, ¶ 36. Here, the District Court's findings are supported by substantial evidence.

¶66 This case involves two friends who were widowed, and who enjoyed each other's company. The majority incorrectly characterizes this relationship as one of control and manipulation. I believe, as apparently the District Judge who heard the case believed, that it was a relationship of friendship and mutual support that had existed for some 30 years.

¶67 An inheritance does not exist until the owner of an estate dies. Maggie announced on numerous occasions that she was spending her relatives' inheritance. It is not the Court's place to supplant its ideas of how an estate should have been distributed. This was two long-time companions reinforcing each other.

¶68 All the surrounding circumstances support this conclusion. Maggie had no children, and the few relatives she had showed very little interest in her while she lived. It was natural that she should turn to her long time friend for comfort and support. Alice did not keep Maggie under lock and key. Rather, she attempted to provider interaction within their community. Together they went on adventures and spent money that was Maggie's money to spend. Susceptibility does not equal undue influence. All four of the criteria for establishing undue influence must be satisfied. Matter of Estate of Eggebrecht, 1998 MT 249, ¶ 11, 291 Mont. 174, ¶ 11, 967 P.2d 388, ¶ 11. When the evidence is properly viewed in the light most favorable to Alice, the criteria for establishing undue influence are not satisfied. The District Court correctly concluded that the burden of proof was on Luke to prove undue influence and he did not meet that burden.

¶69 For the reasons set forth above, I dissent.

/S/ WILLIAM E. HUNT, SR.

Justice Karla M. Gray, dissenting.

¶70 I respectfully dissent from the Court's opinion. On issue one, which relates to whether the District Court erred in imposing the initial burden of proving undue influence on Luke, I would address the issue as Luke actually presents it and affirm the District Court. I also would affirm the District Court on issue two, concluding that the burden of proving constructive fraud was on Luke. Finally, I would determine that the District Court's findings of fact are supported by substantial credible evidence.

¶71 In Conclusion of Law No. 4, the District Court determined that "the burden of proving undue influence is on the party claiming it . . . ." Luke agrees this is a correct statement of the general rule of law, but contends a widely-recognized exception to the rule is that a presumption of undue influence arises under certain circumstances which exist in the present case and asserts entitlement to that presumption here. According to the authorities on which Luke relies, the effect of applying the presumption would be to require Alice to prove the absence of undue influence. On this basis, Luke asserts legal error in the District Court's conclusion.

¶72 The problem with Luke's argument is that the "presumption exception" is taken from other jurisdictions. No Montana authority is cited in support of it and, indeed, Montana authority is to the contrary. Undue influence is never presumed and must be proven like any other fact. *See Christensen*, 240 Mont. at 397, 784 P.2d at 911 (citation omitted).

¶73 The Court, in fact, agrees undue influence is never presumed and cites *Christensen* for that proposition. Having thus rejected Luke's argument, it is my view that the Court should simply affirm the District Court's correct legal conclusion that the burden of proof as to undue influence is on the party claiming it, here Luke.

¶74 Instead, the Court shifts the issue before us by applying the five-criteria test set forth in *Christensen* to determine whether Luke met the burden of proving the exercise of undue influence. I have no quarrel with the *Christensen* test or its application in a case raising the issue of whether a party satisfied that test. The problem with the Court's approach in applying the *Christensen* test here is that Luke does not raise the issue in the opening brief and, indeed, does not challenge the second portion of the District Court's Conclusion of Law No. 4, namely, that Luke failed to prove the gifts Alice received from Maggie were the product of undue influence. It is my view that the Court errs in raising a different issue relating to undue influence, namely whether Luke met the *Christensen* criteria, and in

resolving it to Luke's advantage by weighing the evidence of record differently than did the District Court. This error leads the Court into further error in its conclusion, as to issue three, that it need not address the trial court's findings. The fact is that the Court has already effectively reversed the trial court's findings in issue one, by reweighing the evidence. I simply cannot agree.

¶75 Similarly, and briefly stated, I disagree with the Court's analysis of issue two relating to the burden of proving constructive fraud. As is the case with undue influence, and as the Court concedes, fraud is never presumed; it must be proven by the party claiming it. *Bengala,* 250 Mont. at 105, 818 P.2d at 373. From this fundamental premise, the Court's analysis moves through a maze of factually and legally distinguishable cases and a statute since repealed and, therefore, no longer available as a basis for related determinations, ultimately resting on an existing statute, § 72-34-105(3), MCA, to impose a presumption of a violation of a trustee's fiduciary duty where a transaction occurs during the existence of the trust by which a trustee obtains an advantage from the beneficiary. The Court's discussion and application of that statute in the present case raises several concerns.

¶76 First, the Court shifts from the constructive fraud claim, raised and tried in this case, to a violation of fiduciary duty theory and related statutory presumption. Second, the application of this statute presumes the existence of an actual trust, rather than merely the existence of an agency relationship which renders the agent subject to duties like that of a trustee. Third, and most troubling, is the Court's statement with regard to § 72-34-105(3), MCA, that "Alice *ostensibly benefitted* from numerous transactions." (Emphasis added.) My initial concern about this statement is that the presumption contained in § 72-34-105 (3), MCA, clearly does not arise unless and until the party raising the issue establishes the benefit or advantage to the "trustee." In other words, even assuming the applicability of this statute, it is clear that Luke must first prove such a benefit or advantage to Alice before the presumption comes into play. Moreover, the Court is essentially assuming that the benefit to Alice occurred, through its use of the phrase "ostensibly benefitted." The problem is that the Court has again reweighed the evidence of record in Luke's favor to determine that such a benefit occurred. In doing so, the Court totally ignores the District Court's finding that all money withdrawn from Maggie's accounts during the period at issue was used for Maggie's benefit and care or for the mutual benefit of Maggie and Alice, and with Maggie's consent and approval. At the same time--in issue three--the Court determines that it need not address the trial court's findings. Certainly, under the Court's approach, there is no need to address findings it already has redetermined in the guise of resolving the purely legal issue presented here.

¶77 I would affirm the District Court on all issues presented by Luke. In this regard, I join what I perceive to be Justice Hunt's concern that, in focusing its concerns on the niece and nephew who paid Maggie little attention during her life, the Court has totally misread the relationship between Maggie and Alice. In my view, the Court also has misapplied the law. I dissent.

/S/ KARLA M. GRAY